776 F.2d 931
 UNITED STATES of America, Plaintiff-Appellee,
v.
Angel Rey GONZALEZ, Antonio Barrios, Laureno Antonio
Gonzalez, Rafael Salvador Gonzalez, Emilio Reyes
Royer and Jose Alejandro Severino,
Defendants-Appellants.
 No. 84-5709.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 1, 1985.
 
 Jose M. Quinon, P.A., Coral Gables, Fla., for Laureno Antonio Gonzalez, Rafael Salvador Gonzalez, Emilio Reyes Royer and Jose Alejandro Severino.
 Roy J. Kahn, Sonnia Escobio O'Donnell, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.
 Appeal from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and HATCHETT, Circuit Judges, and THOMAS*, District Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 In this case, six defendants appeal the denial of their motion to dismiss an indictment[1] charging them with knowingly and intentionally possessing, with intent to distribute, marijuana on board a vessel within the customs waters of the United States, 21 U.S.C. Sec. 955a(c). They contend that the operation of section 955a(c), under which the United States may extend its customs waters to specific foreign vessels through arrangements with foreign nations violates their constitutional right to due process. They also claim that no "arrangement" within the meaning of the statute existed in this case.
 
 
 2
 This court already has held that by adopting the term "customs waters," Congress intended section 955a(c) to apply extra-territorially, and that Congress contemplated executive arrangements with foreign nations which would designate specific vessels as within "customs waters." United States v. Romero-Galue, 757 F.2d 1147 (11th Cir.1985). We now hold that designating "customs waters" around a specific vessel on the high seas, thereby subjecting persons on board to United States prosecution, does not violate due process. We also hold that the arrangements regarding specific vessels may be informal, as long as there is a clear indication of consent by the foreign nation. Accordingly, we affirm the district court's refusal to dismiss the indictment.
 
 I. FACTS
 
 3
 The six defendants, all foreign nationals, were crew members aboard the ROSANGEL, a Honduran vessel. On May 24, 1984, the United States Coast Guard cutter V. LYPAN intercepted the ROSANGEL approximately 125 miles due east of Fort Lauderdale, Florida. A Coast Guard officer observed "bale type objects" on the main deck of the ROSANGEL. Coast Guard personnel boarded and searched the vessel, finding 114 bales of marijuana on the main deck and in the forward hold.
 
 
 4
 After a documentation check revealed that the vessel was of Honduran registry, the Coast Guard contacted the Honduran government by telephone and, with Captain Barrios' permission, waited on board the ROSANGEL for a response. When the Honduran government subsequently issued a statement of "no objection" to the boarding, search, seizure, and prosecution of the crew members of the ROSANGEL under United States law, the six defendants were arrested and transported to Miami for indictment and prosecution.
 
 II. THE MARIJUANA ON THE HIGH SEAS ACT
 
 5
 The defendants were indicted under the Marijuana on the High Seas Act of 1980, 21 U.S.C. Sec. 955a-955d.[2] Congress adopted the Act in an effort "to prohibit all acts of illicit trafficking in controlled substances on the high seas which the United States can reach under international law." H.R.Rep. No. 323, 96th Cong., 1st Sess. 11 (1979). To achieve this goal, Congress created four different criminal offenses. Congress forbade possession with intent to distribute by any person on board United States vessels or vessels subject to United States jurisdiction, 21 U.S.C. Sec. 955a(a),[3] and on board any vessel by a citizen of the United States. 21 U.S.C. Sec. 955a(b). Neither of these provisions require intent to distribute within the United States. Section 955a(d) proscribed possession with intent to distribute in the United States. These three provisions left a serious gap in Congress' effort to reach "all acts of illicit trafficking": possession with intent to distribute by foreign nationals on board foreign vessels, in cases where intent to distribute within the United States could not be shown. Congress filled the gap with section 955a(c), which states:
 
 
 6
 It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
 
 
 7
 "Customs Waters" is defined in 19 U.S.C. Sec. 1401(j):
 
 
 8
 The term "customs waters" means, in the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement and, in the case of every other vessel, the waters within four leagues of the coast of the United States.
 
 
 9
 Id. (emphasis added).
 
 
 10
 The appellants' vessel was well beyond four leagues from the coast of the United States, and therefore we must consider whether a "treaty or other arrangement" had expanded this nation's "customs waters" to include those surrounding the vessel.
 
 
 11
 III. WAS THE ROSANGEL WITHIN THE "CUSTOMS WATERS" OF THE
 
 
 12
 UNITED STATES?
 
 
 13
 The appellants contend that the telephonic relay of consent by the Honduran government does not constitute a "treaty or other arrangement" necessary to extend customs waters beyond twelve miles. We disagree. In enacting section 955a(c), Congress contemplated that the Coast Guard would seek permission from foreign governments to prosecute foreign nationals found on foreign vessels on the high seas. Obviously, Congress did not intend that the United States negotiate formal treaties with respect to each vessel; rather Congress contemplated the precise type of consent shown in the present case.
 
 
 14
 A. Congress Contemplated Arrangements Regarding Specific Vessels
 
 
 15
 Much of our work already has been done. In United States v. Romero-Galue, 757 F.2d 1147 (11th Cir.1985), we held that Congress intended section 955a(c) to have extra-territorial effect, and that the statute did not violate international law. Romero-Galue also noted that section 955a(c) was based on the Anti-Smuggling Act.[4]
 
 
 16
 In Romero-Galue, the panel discussed the purpose of the Anti-Smuggling Act:
 
 
 17
 Congress first formulated the definition of "customs waters" when it passed the Anti-Smuggling Act of 1935, 19 U.S.C. Secs. 1701-1711 (1982), to reduce the smuggling of liquor into the United States in contravention of our revenue laws. Prior to the passage of the Anti-Smuggling Act, the government could only prosecute smugglers in vessels seized within the statutory twelve-mile customs waters area; smuggling vessels could hover beyond that twelve-mile limit with impunity. The United States did have liquor treaties with sixteen nations, which allowed it to seize a treaty nation's vessel and to enforce the anti-smuggling laws if the vessel was caught within one hour's sailing distance of the coast of the United States, but these treaties were not self-executing. Absent statutory authority, the United States lacked the power to apply its penal laws to a treaty nation's vessel located outside the twelve-mile limit, yet within one hour's sailing distance from the shore.
 
 
 18
 Id. at 1152-53 (footnote and citations omitted). Congress therefore defined the term "customs waters" to include "the waters within such distance of the coast of the United States" as identified by "treaty or other arrangement" with a foreign government as an area within which the laws of the United States may be enforced. 19 U.S.C. Sec. 1709(c). In addition to setting forth a definition of "customs waters" that allowed the enforcement of this nation's anti-smuggling laws outward of twelve miles pursuant to a treaty, Congress created the concept of a "customs enforcement area." 19 U.S.C. Sec. 1701. A "customs enforcement area" could be declared for one hundred miles around a particular vessel "hovering" off the coast of the United States and suspected of smuggling. A vessel is "hovering" if "from the history, conduct, character, or location of the vessel, it is reasonable to believe that such vessel is being used or may be used" for smuggling. 19 U.S.C. Sec. 1709(d). There is no requirement that the vessel be within a particular distance of the United States coast.
 
 
 19
 In Romero-Galue we held that Congress inserted the term "arrangement" in its definition of "customs waters" in the Anti-Smuggling Act to refer to arrangements setting forth a "customs enforcement area." Id. at 1153. The "arrangement" extends "customs waters" to include those within the "customs enforcement area." Accordingly, when Congress adopted the same definition of "customs waters" for the purposes of section 955a(c), it authorized enforcement beyond twelve miles both in waters designated by treaties and pursuant to arrangements concerning specific vessels.[5]
 
 
 20
 B. An "Arrangement" Existed Concerning Enforcement of United States Law Around the Rosangel
 
 
 21
 Romero-Galue did not address what may constitute an "arrangement" to create "customs waters" around a particular vessel.[6] The appellants contend that a formal, written agreement is necessary. We do not agree. First, requiring a formal agreement would be contrary to the common understanding of the statutory language. Second, the realities of enforcing narcotics laws on the high seas and the limited scope of the consent lead us to conclude that no formal agreement is necessary, and that consent may be relayed by electronic communications such as radio or telephone.
 
 
 22
 The statute refers to a "treaty or other arrangement." 19 U.S.C. Sec. 1401(j) (emphasis added). If the United States were relying on a "treaty" in the current matter, obviously we would look for some sort of compact, formally signed and solemnly ratified. Black's Law Dictionary 1346 (5th ed. 1979). However, here the United States is relying on an "arrangement." Appellants point to nothing in the statute or legislative history which indicates Congress did not intend the word to be given its ordinary meaning. Nor do we know of any special meaning of the term in the context of international law. An arrangement is simply a "settlement or adjustment," Webster's Third New International Dictionary 120 (1976), and the term contemplates no particular form.
 
 
 23
 Requiring execution of a formal agreement would defeat the purpose of the statute, which is to allow enforcement against particular vessels found hovering off the coast. Obviously, a vessel laden with marijuana would not leisurely lay at anchor just beyond four leagues from our shore while United States diplomats journeyed to Honduras, or other appropriate nation, negotiated an agreement, and awaited the approval of the proper bodies within the party nations. It is doubtful that the pride of our diplomats would be offended by this court's observation that during the course of obtaining such an agreement, convoys of vessels could journey back and forth laden with contraband. Once an agreement was in force, the smugglers could simply obtain a different vessel.[7]
 
 
 24
 Nor would a formal agreement serve any useful purpose. All that the law contemplates is that the foreign nation give express consent to the enforcement of United States laws with respect to the particular vessel. The consenting nation's rights under international law or treaty remain unchanged, as the consent applies only to the particular vessel involved. Consent is a simple notion; it can be granted or refused, and no formal agreement is necessary to understand either option.
 
 
 25
 Finally, in the legislative history Congress noted that "[t]he time required to obtain prior consent to board 'mother ships' on the high seas has apparently been significantly reduced," indicating that it intended to take advantage of such consent. H.R.Rep. No. 323, 96th Cong., 1st Sess. 7 (1979). The record in this case demonstrates that such an arrangement existed. Honduras specifically consented to the United States asserting jurisdiction over the ROSANGEL.[8]
 
 
 26
 C. No Treaty is Necessary Before the United States Seeks to Make Arrangements Regarding Vessels
 
 
 27
 The appellants also argue that even if the consent of Honduras satisfies the statutory requirement for an "arrangement," the statute only authorizes arrangements with "treaty nations." Accordingly, they argue that because no treaty between Honduras and the United States authorizes arrangements, no arrangement existed within the meaning of section 955a(c). The appellants contend that Romero-Galue supports their position. 757 F.2d at 1154.
 
 
 28
 This contention also fails. First it runs contrary to the statutory language. The definition of "customs waters" refers to "treaty or other arrangement." 19 U.S.C. Sec. 1401(j) (emphasis added). The appellants' argument would amend the definition to read "treaty or other arrangement executed pursuant to a treaty." We decline to rewrite the work of Congress. Appellants point to nothing in the statute or legislative history that indicates Congress contemplated that the United States would negotiate treaties before it began to seek arrangements regarding particular vessels. On the contrary, the legislative history refers to successful initiatives to reduce the time necessary to obtain consent to board ships. H.R.Rep. No. 323, 96th Cong., 1st Sess. 7 (1979). If Congress did not intend to take advantage of these successful initiatives until treaties were negotiated, surely Congress would have mentioned the necessity to undertake such negotiations forthwith. Appellants advance no congressional purpose, and we can think of none that such a treaty requirement would serve; if the United States can achieve its goal of arrangements without a treaty, then why would Congress require one? Such a requirement would be directly contrary to the express statement of Congress that it intended to reach "all acts of illicit trafficking." H.R.Rep. No. 323, 96th Cong., 1st Sess. 11 (1979).
 
 
 29
 Nor is Romero-Galue supportive of the assertion. Romero-Galue involved a telephonic relay of consent, and nothing in the opinion indicates the alleged arrangement was authorized by a treaty. Indeed the Romero-Galue court remanded for a determination of whether "a treaty or other arrangement existed." 757 F.2d at 1154 (emphasis added). Accordingly we hold that nothing in the Marijuana on the High Seas Act requires a treaty before the United States may seek an arrangement.
 
 
 30
 IV. DOES THE ENFORCEMENT OF AMERICAN NARCOTICS LAWS ON THE
 
 
 31
 HIGH SEAS VIOLATE THE CONVENTION ON THE HIGH SEAS?
 
 
 32
 Appellants further contend that their vessel was protected under the Convention on the High Seas, opened for signature April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962). Article 6 of the Convention provides that ships are subject only to the jurisdiction of their flag nation, and article 22 prohibits a warship from boarding foreign merchant ships on the high seas except if there is reasonable grounds to suspect piracy, slave trading, or if the vessel is actually of the same nationality as the warship. Settled law of this circuit dictates that this contention be rejected. First we note that Honduras has not ratified the treaty, and therefore its provisions are not available to the appellants. United States v. Cadena, 585 F.2d 1252 (5th Cir.1978).[9] Even more significant is our holding that the Convention is not self-executing, and that the United States' ratification of the treaty did not "incorporate the restrictive language of article 6, which limits the permissible exercise of jurisdiction to those provided by treaty, into its domestic law and make it available in a criminal action as a defense to the jurisdiction of its courts." United States v. Postal, 589 F.2d 862, 878 (5th Cir.1979).[10]
 
 
 33
 Accordingly, nothing in the Convention prevents the United States from enforcing section 955a(c) against foreign nationals found on foreign vessels on the high seas.
 
 
 34
 V. WHETHER SECTION 955a(c) VIOLATES DUE PROCESS?
 
 
 35
 The appellants further assert that the operation of section 955a(c) violates their constitutional right to due process. They contend that because persons aboard a vessel never know when it will be within a "customs enforcement area" the statute does not give fair notice of what conduct violates the law and what conduct does not. The due process clause of the fifth amendment requires that a statute be declared void if it is so vague that "men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Appellants also claim that the statute violates the constitutional prohibition of ex post facto laws because conduct does not constitute possession within "customs waters" until after the foreign government consents. Our decision in Romero-Galue specifically reserved the question of the constitutionality of section 955a(c). 757 F.2d at 1151.
 
 
 36
 There is a superficial appeal to the appellants' arguments. The criminal violation does require possession within "customs waters" and the appellants were not in "customs waters" until the foreign government consented. However, the statute is not an ex post facto law. An ex post facto law is a law which makes conduct, innocent when done before passage of the law, criminal. Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798); W. LaFave & A. Scott, Criminal Law, 89-90 (1972). Section 955a(c) does not apply retroactively to acts committed before it was passed; appellants' conduct in the current matter occurred well after enactment.
 
 
 37
 In asserting that the statute does not give fair warning of what conduct is forbidden, the appellants misunderstand both the congressional purpose and the basis of the statute in international law. To address their contentions, we must first discuss the purpose and basis of section 955a(c).
 
 
 38
 Romero-Galue determined that international law does not prohibit the enforcement scheme set forth in the Marijuana on the High Seas Act. 757 F.2d at 1154. We noted there that nothing prevents two nations from agreeing that the domestic law of one nation shall be extended into the high seas. Section 955a(c) requires consent by the foreign nation before enforcement of the United States law. Even absent consent, however, the United States could prosecute foreign nationals on foreign vessels under the "protective principle" of international law, id., which permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security or could potentially interfere with the operation of its governmental functions. Id. at 1154. Congress grounded section 955a(c) on this principle. H.R.Rep. No. 323, 96th Cong., 1st Sess. 7-8, 10, 12-13 (1979); Romero-Galue, 757 F.2d at 1154 n. 21.
 
 
 39
 Reliance on the protective principle is not a novel idea in American law. Indeed, the protective principle was the basis Congress cited for the Anti-Smuggling Act. S.Rep. No. 1036, 74th Cong. 1st Sess. 5 (1935). The Senate Report to that legislation noted that "there is no fixed rule among the customs and usages of nations which prescribes the limits of jurisdictional waters other than the rule of reasonableness, that a nation may exercise authority upon the high seas to such an extent and to so great a distance as is reasonable and necessary to protect itself and its citizens from injury." Id. The Senate Report also noted the opinion of Chief Justice Marshall in Church v. Hubbart, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804), which observed that "[i]f this right be extended too far it will be resisted." Id. at 235. The Chief Justice was discussing enforcement of a common type of law in the days of mercantilism, a colonial power's prohibition against trade with its colonies by other nations. He stated that:
 
 
 40
 Thus in the channel, where a very great part of the commerce to and from all the north of Europe, passes through a very narrow sea, the seizure of vessels on suspicion of attempting an illicit trade, must necessarily be restricted to very narrow limits; but on the coast of South America, seldom frequented by vessels but for the purpose of illicit trade, the vigilance of the government may be extended somewhat further and foreign nations subject to such regulations as are reasonable in themselves and are really necessary....
 
 
 41
 Id. at 235. Chief Justice Marshall's words are no less vital today. In the waters between certain areas of Latin America and our nation, nations judge what is reasonable in light of the massive drug trade in those waters. One need only glance at a map of the region and compare the vast length of United States coast to the narrow straits between Yucatan and Cuba (where the vessel was boarded in Romero-Galue, 757 F.2d at 1149) and the other narrow passages through the West Indies to understand the reasonableness of enforcing our drug laws outside of our territorial sea. Apparently, foreign nations such as Honduras recognize the reasonableness of current United States enforcement efforts, for consent has been given.
 
 
 42
 Congress' purpose in enacting section 955a was clearly stated. The Act was "designed to prohibit all acts of illicit trafficking in controlled substances on the high seas which the United States can reach under international law." H.R.Rep. No. 323, 96th Cong., 1st Sess. 11 (1979). Congress adopted section 955a(c) and relied on the protective principle because it is often difficult to prove beyond a reasonable doubt that a vessel seized on the high seas carrying contraband was headed for the United States. S.Rep. No. 855, 96th Cong., 1st Sess. 1 (1979). The protective principle does not require that there be proof of an actual or intended effect inside the United States. The conduct may be forbidden if it has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems. Restatement (Second) of Foreign Relations Law of the United States Sec. 33;[11] United States v. Marino-Garcia, 679 F.2d 1373, 1381 & n. 14 (11th Cir.1982). Congress has determined, therefore, that distribution of marijuana and other narcotics meets these criteria. Appellants do not contest the determination of Congress, nor do we believe there would be any basis to attack it. As noted above, that reasonable nations accept the authority advanced by Congress in section 955a(c) is demonstrated by the consent that has been given.
 
 
 43
 Congress faced a difficulty, however, in flexing fully its legal authority under the protective principle. Although Congress' planned extension of authority was reasonable, there was no need to risk unnecessary friction with foreign nations. Such friction would not stem from the extension of the United States' drug laws to foreign nationals on the high seas, but from the stopping and seizing of foreign vessels on the high seas. The legislative history reflects Congress' ambivalence between its respect for exclusive state flag jurisdiction on the one hand, and the long history of extra-territorial United States jurisdiction on the other.[12] In light of the fact that nations already were giving consent before passage of the law,[13] and considering the reasonableness of the law, Congress likely believed that obtaining consent would not unduly hinder enforcement efforts; it could achieve its enforcement goal and at the same time minimize any foreign objections. Accordingly, Congress borrowed the notion of "customs waters" and "customs enforcement areas" from the Anti-Smuggling Act; section 955a(c) would not be enforced without the consent of the foreign nation. The "customs waters" approach was adopted for these reasons and not because of any limitations on the authority of the United States in either international law or treaties. It is misleading, therefore, to consider that consent an element of the offense; rather, it is a diplomatic requisite illustrating the international partnership that ensures the rule of law on the high seas. The law will not be enforced on the high seas against a foreign nation's vessels without that nation's consent.[14]
 
 
 44
 Our review of the basis and purpose of section 955a(c) convinces us that the appellants' due process contentions are illusory. There is nothing vague about the statute. Congress has provided clear notice of what conduct is forbidden: any possession of marijuana on the high seas with intent to distribute. The United States will enforce this law to the full extent of its ability under international law. Congress has afforded a legislative grace to our fellow nations by conditioning enforcement of the law upon their consent. This grace, however, does not create a notice problem. Both the offense and the intent of the United States are clear. Those embarking on voyages with holds laden with illicit narcotics, conduct which is contrary to laws of all reasonably developed legal systems, do so with the awareness of the risk that their government may consent to enforcement of the United States' laws against the vessel. Due process does not require that a person who violates the law of all reasonable nations be excused on the basis that his own nation might have requested that he not be prosecuted by a foreign sovereign. Accordingly we hold that appellants' challenge to the constitutionality of section 955a(c) is without merit.
 
 VI. CONCLUSION
 
 45
 On the basis of the foregoing discussion, the denial of the appellants' motion to dismiss the indictment is AFFIRMED.
 
 HATCHETT, Circuit Judge, specially concurring:
 
 46
 I specially concur in the majority opinion, rather than dissent, because United States v. Romero-Galue, 757 F.2d 1147 (11th Cir.1985), is binding on this panel. Having considered the legislative history, I am of the opinion that Congress intended in enacting Title 19 U.S.C. Sec. 1401(j), defining customs waters, to require prior agreement between the United States and other nations through treaty or other arrangement defining an area in which the United States would board vessels suspected of bearing controlled substances. The area described by treaty or arrangement could include the entire world.
 
 
 47
 Nothing is gained by Romero-Galue 's narrow interpretation of the statute. It restricts the Coast Guard's jurisdiction to one vessel at a time based upon the happenchance of communicating successfully and obtaining consent. A broader interpretation of the statute was intended by Congress. With a treaty or arrangement the Coast Guard would be able to board vessels in designated areas of the seas, or all over the world, without doubt or hesitation.
 
 
 48
 It is difficult to believe that Congress intended to define the "customs waters" of the United States on the basis of where a particular foreign vessel suspected of drug trafficking happened to be located on the face of the globe when the Coast Guard located it. Still more unbelievable is the notion that the meaning of "customs waters" depends upon the Coast Guard's completing telephone calls in which it obtains foreign nations' consent on a vessel-by-vessel basis.
 
 
 49
 The legislative history shows a desire to cure the deficiencies in existing law. The deficiencies resulted from an inadvertent repeal of the law enabling the United States to prosecute its own citizens for drug smuggling on the high seas and from doubt by federal district courts of the legal grounds to prosecute foreign flag ships seized by the Coast Guard. See H.R. No. 323, 96th Cong. 1st Sess. 4 and 5 (1979). The Committee on Merchant Marine and Fisheries noted in the report of Mr. Murphy the damage this lack of prosecution did to Coast Guard morale. Id. at 6. The legislation was intended to tighten the noose around smugglers using foreign flag ships by prosecuting to the full extent permitted by the law and by creating generous presumptions of intent to smuggle. Id. at 11 and 10.
 
 
 50
 Although the legislative history is not a model of clarity, it includes references to concepts of consent and to the concept of extraterritorial jurisdiction. But the heart of the legislation is the incorporation of the existing enforcement structure found in the Tariff Act of 1930, 19 U.S.C. Sec. 1401(j) and the Anti-Smuggling Act of 1935, which amended the definition of customs waters and added the concept of customs enforcement areas, see 19 U.S.C. Sec. 1701. H.R. No. 323 at 13. Neither the customs waters concept nor the customs enforcement area concept describes informal processes. The customs enforcement area was devised to supplement formal treaty making as a basis for enforcement in customs waters with special executive arrangements based on specific fact findings of the President of the United States. See 19 U.S.C. Sec. 1701.
 
 
 51
 The act under which the appellants were prosecuted rests upon this statutory plan to give the President flexible powers to designate enforcement areas. The legislative history of 21 U.S.C. Sec. 955a attempts to summarize the jurisdiction of the United States based on the incorporated law as follows: (1) stateless vessels, (2) vessels within United States customs waters, (3) vessels flying a foreign flag with the prior consent of the flag state, and (4) United States citizens on board any vessel. H.R. No. 323 at 7. Only a superficial reading of the relevant legislative history supports the interpretation that obtaining prior consent is as easy as picking up the telephone. The four bases listed by the legislative report are all grounded in stable claims to jurisdiction that give the Coast Guard an unqualified go-ahead to seize a ship and its illicit cargo, arrest the occupants, bring charges, and obtain convictions.
 
 
 52
 Under a coherent framework of jurisdiction, it would be inconceivable to suggest that smugglers could challenge their arrest by subpoenaing the telephone bill of the Coast Guard. I believe, in fact, that it is highly doubtful that a smuggler would have any standing to challenge either a treaty or a special executive arrangement. If the court takes seriously the idea that section 955a(c) claims extra-territorial jurisdiction based on sovereignty, the remand in Romero-Galue, 757 F.2d at 1154, to explore the consent issue as a mixed fact-law question makes no sense. The court must choose a theory of jurisdiction, even though Congress wavered.[1]
 
 
 53
 I believe that Congress intended for the President to give the Coast Guard the enforcement tools it needs by defining enforcement areas in advance and for the courts to recognize the jurisdiction thus claimed by the President without creating procedural hurdles for the Coast Guard to surmount in each and every vessel sighting.
 
 
 54
 This circuit must provide a more stable, understandable interpretation of this key enforcement statute.
 
 
 
 *
 Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 The defendants entered conditional pleas of guilty to one of the counts in the indictment, reserving the right to appeal the denial of their motion to dismiss the entire indictment. As part of the plea bargain, the United States agreed to dismiss a conspiracy count under 21 U.S.C. Sec. 955c
 
 
 [2]
 The high seas lie seaward of a nation's territorial sea, which is the band of water that extends up to three miles out from the coast. Since 1790, when Congress adopted An Act to Provide More Effectually for the Collection of the Duties, ch. 35, 1 Stat. 145 (1790), the United States has specified a twelve-mile area in which foreign vessels bound for the United States may be boarded and inspected. The Supreme Court approved this authority in dictum in Church v. Hubbart, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804)
 
 
 [3]
 The Eleventh Circuit upheld the constitutionality of 21 U.S.C. Sec. 955a(a) in United States v. Marino-Garcia, 679 F.2d 1373, 1383-84 (11th Cir.1982) (stateless vessels), and United States v. Julio-Diaz, 678 F.2d 1031 (11th Cir.1982) (vessels of the United States)
 
 
 [4]
 The definition of "customs waters" is the same for both laws. See 21 U.S.C. Sec. 955b(a) (adopting definition in 19 U.S.C. Sec. 1401(j)); 19 U.S.C. Sec. 1709(c)
 
 
 [5]
 "This section is intended to encompass all vessels and persons actually or constructively present within the customs waters, thereby incorporating by reference the domestic statutory provision governing hovering vessels." H.R.Rep. No. 323, 96th Cong., 1st Sess. 10
 
 
 [6]
 In Romero-Galue Coast Guardsmen approached and boarded a Panamanian vessel in the Caribbean. After finding marijuana, the Coast Guard contacted the State Department, which contacted the Panamanian government. 757 F.2d at 1149. Because the district court had incorrectly believed that 955a(c) did not have extra-territorial effect, it had not considered whether an arrangement existed. The panel remanded the case for trial, noting that the existence of an arrangement is a mixed question of fact and law. 757 F.2d at 1154
 The new Fifth Circuit has affirmed a section 955a(c) conviction under similar facts. In United States v. Loalza-Vasquez, 735 F.2d 153 (5th Cir.1984), a Coast Guard vessel sighted a vessel on the high seas, 250-300 miles from the United States. The Coast Guard vessel contacted its headquarters, which in turn contacted the State Department. The State Department contacted the Panamanian government, which gave permission to board the vessel. 735 F.2d at 157 n. 2.
 
 
 [7]
 Congress enacted section 955a(c) because merely putting vessels out of action was not satisfactory. Before enactment of section 955a(c), the Coast Guard could only seize the cargo and vessel. Smugglers accepted the loss of a vessel as a cost of business. S.Rep. No. 855, 96th Cong. 1st Sess. 2 (1979)
 
 
 [8]
 Our holding that an informal consent regarding a specific vessel constitutes an "arrangement" under the statute in no way addresses or precludes either more formal or more sweeping executive agreements with foreign nations
 
 
 [9]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [10]
 Even if ratification had created limits on United States jurisdiction, section 955a(c) was enacted subsequent to ratification, and therefore would override any inconsistent treaty provisions. Whitney v. Robinson, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888)
 
 
 [11]
 Section 33(1) of the Restatement provides:
 A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the laws of states that have reasonably developed legal systems.
 The comment to section 33 elaborates:
 c. Relationship to Sec. 18. Under the rule stated in Sec. 18, a state does not have jurisdiction to prescribe a rule of law governing conduct outside its territory that has no effect within its territory. Under the rule stated in Subsection (1) of this Section, a state may prescribe a rule of criminal law applicable to conduct outside its territory that does not have sufficient effect within its territory to bring it within the rule stated in Sec. 18 but that has a potentially adverse effect upon its security or governmental functions.
 
 
 [12]
 The House Report states:
 Recognition of exclusive state flag jurisdiction as the premise underlying the concept of freedom of the high seas compels the most circumspect and judicious consideration before exercising any sovereign right of unilateral action in accomplishment of national objectives.
 Notwithstanding the U.S. has long held that it has the inherent right to exercise extra territorial jurisdiction over persons committing offenses contrary to our law by virtue of their impact on our vital national interests.
 H.R.Rep. No. 323, 96th Cong., 1st Sess. 6.
 
 
 [13]
 See H.R.Rep. No. 323, 96th Cong., 1st Sess. 7 (1979)
 
 
 [14]
 On the surface, there may seem to be a conflict between our reliance on Congress' assertion that it intended to exercise its full authority under international law, and our assertion that the consent Congress called for is not required by international law. What Congress sought to do was to prevent drug smugglers aboard vessels from advancing the very types of arguments appellants advanced in this proceeding and in Romero-Galue, that although Congress could have reached their conduct under international law, somehow section 955a(c) does not apply to their possession of marijuana. While seeking to assert its full authority, Congress also tempered the law with the requirement of consent. Obviously, the consent is a courtesy to our neighbor states and not a courtesy to drug smugglers. We remain confident that the appellants were aware that their conduct violated the law of all nations with reasonably developed legal systems. It may be one thing for drug smugglers caught aboard a foreign vessel to contend that their country did not in fact consent to their prosecution under United States law. Due process, however, does not require that a person who violates the law of all reasonable nations be excused on the basis that his own nation might have requested that he not be prosecuted by a foreign sovereign
 
 
 [1]
 Besides reciting the doctrine of extraterritorial jurisdiction, the Committee's report also cites with approval, as having the greatest potential for success in denying source country smugglers exclusive flag state protection under international law, the recommendation of the State Department of a model statutory scheme in which foreign governments amend their domestic law to conform to a uniform statutory scheme outlawing drugs outside their territory. The two ideas--extraterritorial jurisdiction and an international model code--are scarcely consistent