UNITED STATES of America, Appellee,

v.

Orlando MOLINARES CHARRIS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Juan PIMIENTA REDONDO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Santiago MENESES,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alfredo LOZADA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jaime ISENIA GARCIA,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alfredo PUPO, Defendant, Appellant.

Nos. 86–1176 to 86–1179,
86–1181, 86–1182.

United States Court of Appeals,
First Circuit.

Argued May 7, 1987.

Decided June 29, 1987.

1214

Jose E. Rossy-Valderrama, San Juan, P.R., on brief, for appellant Orlando Molinares Charris.

Olga M. Shepard, Hato Rey, P.R., for appellant Juan Pimienta Redondo.

Jose M. Ortiz Miller, Hato Rey, P.R., on brief, for appellant Santiago Meneses.

James D. Noel, Hato Rey, P.R., by Appointment of the Court, for appellant Alfredo Lozada.

Benito I. Rodriguez Masso, Caguas, P.R., by Appointment of the Court, for appellant Jaime Isenia Garcia.

Jose A. Fuentes Agostini, by Appointment of the Court, with whom Troncoso & Fuentes-Agostini, San Jose, P.R., was on brief, for appellant Alfredo Pupo.

Warren Vazquez, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before BOWNES and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

BOWNES, Circuit Judge.

Appellants are six defendants who were convicted on two counts under 21 U.S.C. § 955a (1982) for possessing marijuana with an intent to distribute it. They were aboard a vessel, which had sailed from Colombia and was intercepted by the Coast Guard near the U.S. Virgin Islands. The Coast Guard found 9,540 pounds of marijuana on board. Appellants contest their two convictions for what they argue was a single offense. They also challenge the sufficiency of the evidence and claim that there were several errors in the trial proceedings. We reverse the convictions on

---

* Of the District of Massachusetts, sitting by designation.

one of the counts because they were based on an erroneous construction of the statute, but find no errors requiring a reversal of the convictions on the remaining count.

## I. SUMMARY OF THE FACTS

In the afternoon of May 15, 1984, the Coast Guard cutter *Point Whitehorn* got underway from St. Thomas, U.S. Virgin Islands, in response to information that there were two vessels in the area suspected of illegal activity. Around 7:00 P.M., when the cutter was approximately seventeen and three-quarters miles off the coast of Anegada Island, the MV *Gilfon*, which had a home port of San Lorenzo, Honduras, printed on its stern, was observed heading to the northwest.

The *Gilfon*'s captain granted the Coast Guard's radio request for permission to board. The only materials being carried in the hold of the seventy-five-foot vessel were bricks and rice straw. According to the *Gilfon*'s captain, the bricks were for ballast and the rice straw was for later use in carrying ice.

About two minutes after boarding, a member of the boarding party notified the boarding officer that he had smelled marijuana near the hatch to the main hold. The boarding officer went to that location and said he also detected it. He said the odor was intermittent, which he attributed to the wind. The Coast Guard's log indicated winds of approximately eighteen knots at the time, measured as the vessel was traveling at fifteen knots.

While searching the lazarette, which is a compartment at the stern of the vessel, the boarding officer smelled wet paint. Some of it rubbed off onto his arm when he brushed against the bulkhead. It was apparent that the hatch covers on access plates leading to fuel tanks had been freshly painted.

On the aft bulkhead of the main hold, on the port side of the vessel, there was a large area that obviously had been cut and rewelded. Marks on the overhead part of the compartment appeared to have been caused by a cutting torch. An oxygen and an acetylene bottle were found on board, as well as a torch and an arc welder. The paint in the welded area was noticeably different than the paint on the adjacent areas. Containers with paint matching that used on the hatch covers in the lazarette and on the welded area in the main hold were found in the pilot cabinet.

The signs of recent work made the boarding party suspicious that something was hidden behind the bulkheads. It inspected two sounding tubes on the main deck that normally would be used for determining the fuel level in the tanks below. The sounding tubes indicated that the tanks were full, but the level did not vary with the vessel's motion as they normally would. Some fuel was removed from one of the tubes and none returned, indicating that they may have been rigged to conceal false tanks. The *Gilfon*'s captain attributed these irregularities to valves being closed. As the boarding party was preparing to go to the main hold to check the valves, the *Gilfon*'s captain said that he was tired and wanted the boarding party to leave. It was approximately 1:30 A.M.; the search had begun around 8:00 P.M. The boarding party left as requested.

The cutter continued to track the *Gilfon*, which reversed course and started heading to the southeast. Meanwhile, the Coast Guard transmitted a request to Honduras for permission to board the *Gilfon* and enforce United States law. On the afternoon of May 16, such permission was received in the form of a statement of no objection.

The nine men aboard the *Gilfon* were mustered on deck while the Coast Guard boarded a second time and resumed its search. Bricks were moved to gain access to the valves mentioned by the *Gilfon*'s captain; when they were opened no fuel came out and there was no change in the sounding tubes. Two holes were then drilled in the bulkhead near the welding marks. Air was sucked in from behind the bulkhead and there was a strong odor of marijuana. A small amount of what tested to be marijuana was extracted through the holes. The vessel was seized and the crew

arrested. Later, access was gained to the false compartments by cutting a hole in the main deck. Large bales of marijuana totalling 9,450 pounds were removed from the compartments.

The nine men who were aboard the *Gilfon* were tried together. They were all convicted of possessing marijuana with an intent to distribute it.[1]

## II. THE TWO CONVICTIONS

21 U.S.C. § 955a provides in pertinent part:

**(a) Vessels of United States or vessels subject to jurisdiction of United States on high seas**

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

**(b) Citizens of United States**

It is unlawful for a citizen of the United States on board any vessel to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

**(c) Vessels within customs waters of United States**

It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

**(d) Intent or knowledge of unlawful importation into United States**

It is unlawful for any person to possess, manufacture, or distribute a controlled substance—

(1) intending that it be unlawfully imported into the United States; or

(2) knowing that it will be unlawfully imported into the United States.

Each of the four offenses in section 955a focuses on a different jurisdictional basis: the vessel's nationality, the citizenship of those on board, the waters in which the vessel sails, or that it is the United States to which the illegal cargo is intended to be imported.

Appellants were convicted on two counts. Count I charged them with violating subsection (a), which applies to "any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas." The district court instructed the jury that a vessel of a foreign nation "may be subject to the jurisdiction of the United States on the high seas" if the foreign nation "consents that the United States enforce its laws upon said vessel." Count II charged appellants with violating subsection (c), which applies to "any person on board any vessel within the customs waters of the United States." The court instructed the jury "that the waters wherein the vessel was located when it was boarded were in fact customs waters of the United States" if it found beyond a reasonable doubt "that there was an arrangement between the government of Honduras and the United States, allowing the United States to board and enforce its laws upon the vessel." Thus, the jury was told in effect that an arrangement between Honduras and the United States could be the jurisdictional basis for a conviction on both counts.

■ As we construe the statute, however, the consent given by Honduras to the enforcement of United States law against the *Gilfon* is a jurisdictional basis covered exclusively by subsection (c). Our conclusion is based on the wording of subsections (a) and (c) of section 955a and the legislative history. Subsection (c) focuses on the waters in which the vessel sails. It was "intended to encompass all vessels and persons actually *or constructively* present within the Customs waters." H.R.Rep. No. 323, 96th Cong., 1st Sess. 10 (1979) (emphasis added). A foreign vessel can be con-

---

1. Only six of the nine are appellants in this case. An appeal by the captain, Nicanor Molinares Charris, was dismissed by this court for lack of jurisdiction. One crew member, Victor Cervera, did not appeal, and another, Emilio Camargo, withdrew his appeal.

structively within customs waters, even though it is on the high seas, if there is "a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States." 19 U.S.C. § 1401(j) (1982); *see United States v. Gonzalez,* 776 F.2d 931, 935–36 (11th Cir.1985); *United States v. Romero-Galue,* 757 F.2d 1147, 1153–54 (11th Cir.1985).[2]

▮ Subsection (c), therefore, extends the reach of United States law to foreign vessels on the high seas searched pursuant to an international agreement. Nothing in subsection (a) indicates that it also was meant to address this situation. In subsection (a), Congress invoked "flag state jurisdiction," "to assert competence over U.S. vessels, wherever they may be, and over vessels without nationality on the high seas." H.R.Rep. No. 323, at 9. " 'Vessel of the United States' means any vessel documented under the laws of the United States, ... or owned in whole or in part by the United States or a citizen of the United States, ... unless the vessel has been granted nationality by a foreign nation...." 21 U.S.C. § 955b(c) (Supp. III 1985). " 'Vessel subject to the jurisdiction of the United States' includes a vessel without nationality or a vessel assimilated to a vessel without nationality...." 21 U.S.C. § 955b(d) (1982).

The *Gilfon* does not fit into any of these categories. To convict appellants under subsection (a), an additional type of vessel—one registered in a foreign nation which has become subject to United States law by international agreement—would have to be read into this part of the statute. The definitional statement in section 955b(d) leaves the door open to an expansive reading. It says that a vessel subject to the jurisdiction of the United States *"includes a vessel without nationality or a vessel assimilated to a vessel without nationality."* (Emphasis added.) The use of the word "includes," rather than "means," implies that vessels other than those expressly mentioned would fit the definition. *See Helvering v. Morgan's, Inc.,* 293 U.S. 121, 125 n. 1, 55 S.Ct. 60, 61–62 n. 1, 79 L.Ed. 232 (1934).

By using an open-ended definition of "a vessel subject to the jurisdiction of the United States on the high seas," perhaps Congress wanted to ensure that all vessels properly subject to United States jurisdiction under the principle of "flag state jurisdiction" would be viewed as covered under subsection (a). *See* H.R.Rep. No. 323, at 11 (expressing congressional intent to have United States law applied to the extent international law allows). But the consent of a foreign nation to the enforcement of United States law was not an unanticipated jurisdictional basis. This situation was expressly addressed in subsection (c). One part of the statute should not be read so expansively as to render another part redundant. Furthermore, the House Report accompanying the statute indicates that Congress intentionally excluded consent of a foreign nation as a jurisdictional basis under subsection (a). The definition of a "vessel subject to the jurisdiction of the United States on the high seas" had included a "vessel flying [a] foreign flag" if the flag state gave prior consent to the enforcement of United States law. H.R.Rep. No. 323, at 7. This language was omitted from the enacted version of the statute, apparently in response to concerns expressed about the jurisdictional and constitutional validity of relying solely on prior consent as a basis for considering a foreign vessel to be "subject to the jurisdiction of the United States on the high seas." *Id.* at 7–9.[3]

---

2. Appellants do not contend that the statement of no objection transmitted on behalf of the government of Honduras to the Coast Guard did not satisfy the requirement for an "arrangement" designating the waters in which the *Gilfon* was searched and seized as customs waters of the United States.

3. The Report does not express similar concerns about using prior consent as a basis for jurisdiction under subsection (c), which focuses on territory rather than nationality.

We decline to read into subsection (a) an alternative jurisdictional basis intentionally left out by Congress and already covered by another part of the statute. Our construction also avoids a potential constitutional problem. Other than the jurisdictional bases, the four offenses in section 955a are identical. In a previous case we upheld the constitutionality of multiple convictions under the statute partly because we construed each offense as requiring "proof of a fact not required by any other." *United States v. Christensen*, 732 F.2d 20, 23 (1st Cir.1984). This is not the case if the jurisdictional facts prerequisite for a conviction under subsection (c) are exactly the same for subsection (a). A statute should not be construed in such a way as to render it unconstitutional if it also can be construed in a way that is constitutional.

We hold that consent by the nation of registry to the enforcement of United States law against one of its vessels on the high seas does not make that vessel "subject to the jurisdiction of the United States on the high seas" under subsection (a). Consequently, the court's jury instruction on the jurisdictional requirement for a conviction under subsection (a) was incorrect. The jury was instructed that "[a] vessel with a nationality other than the United States may be subject to the jurisdiction of the United States on the high seas if the government with jurisdiction over said vessel consents that the United States enforce its laws upon said vessel."

Appellants argue that the court's error in instructing the jury entitles them to an acquittal; they say that the instructions unduly confused the jury. We are constrained in our consideration of this issue by appellants' failure to provide us with a transcript of the jury instructions. They had a duty to ensure that the necessary record was transmitted to this court. Fed. R.App.P. 11(a). We have had to rely instead on two marked-up pages of what appear to be copies of jury instructions, included in Molinares Charris's and Pimienta Redondo's briefs, which the government has treated as an accurate record of the instructions given to the jury.

The only error we find is that regarding the requirements for a conviction under subsection (a). The court properly instructed the jury on the jurisdictional prerequisite for a conviction under subsection (c); it described the definition of customs waters, including the provision that allowed the *Gilfon* to be considered in the customs waters of the United States if it found "that there was an arrangement between the government of Honduras and the United States, allowing the United States to board and enforce its laws upon the vessel." We see no reason to conclude that the instructions so confused the jury that it misunderstood the requirements or failed to follow the law when it convicted appellants for violating subsection (c).

Appellants' convictions on Count I are reversed.

## III. THE SUFFICIENCY OF THE EVIDENCE

Appellants challenge the sufficiency of the evidence used to convict them. "Our standard of review with respect to challenges to the sufficiency of the government's evidence is whether, taken as a whole and viewed in the light most favorable to the government, the evidence and all legitimate inferences therefrom would allow a rational trier of fact to find guilt beyond a reasonable doubt." *United States v. Luciano Pacheco*, 794 F.2d 7, 10 (1st Cir.1986). Viewing the evidence in this way, we hold that it was sufficient to support the verdict.

 The government had the burden of proving that appellants knowingly or intentionally possessed marijuana with an intent to distribute it. Knowing participation in a venture to import marijuana can be inferred from circumstantial evidence. *United States v. Smith*, 680 F.2d 255, 259 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). A jury is entitled to conclude that those aboard a vessel engaged in obvious illegal activity are not innocent bystanders. *United States v. Beltran*, 761 F.2d 1, 6 (1st Cir.1985); *United States v. Lopez*, 709 F.2d 742, 746 (1st Cir.), *cert. denied*, 464 U.S.

861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983). We recognize, of course, that this is not a case in which the crew lived and worked in the areas in which illegal cargo was stowed. The marijuana was found in hidden compartments. The evidence, however, was sufficient to implicate each appellant.

There was testimony that an odor of marijuana was present.[4] Thus, the jury could have believed that during the voyage appellants must have been aware of what was on board. The perceptible odor of marijuana supports an inference that innocent third parties would not have been hired on as members of the crew. *United States v. Guerrero-Guerrero*, 776 F.2d 1071, 1074 (1st Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986).

Regardless of whether the marijuana was hidden in scent as well as sight at the time the Coast Guard encountered the vessel, there was evidence from which it could be found that appellants must have played an active role in transporting the illegal cargo. There was no apparent legitimate purpose for the *Gilfon*'s voyage. Its captain claimed that they had left Colombia to take up operations in Caracao. But when the vessel was seized, it had been at sea for seven days and was far from a course that would lead to Caracao. The jury was entitled to disbelieve the captain's explanation—that they had departed from the planned route in response to a distress signal—and conclude instead that their sole purpose was to pick up and transport marijuana. Appellants had no reason for their presence on this voyage other than to assist in the vessel's operations; they were hired crewmen. There was evidence that only five crew members normally would be needed for a vessel of its size, but there were nine on board. A reasonable conclusion would be that the large crew was needed to load and unload the marijuana and to provide the labor needed in the elaborate concealment effort.[5]

There also was evidence specifically regarding each appellant from which knowing participation could be inferred. Isenia Garcia and Meneses had paint on the shirts they wore and on their arms that matched the fresh paint on the areas leading to the marijuana. Cans of the same paint were on board, as well as equipment for cutting and welding. A reasonable inference would be that the illegal cargo had been concealed only recently, and these two men contributed their labor to the effort. *See United States v. Bland*, 653 F.2d 989, 996–97 (5th Cir.) (reversing convictions of defendants who were on board a tug towing a barge containing marijuana; the court said an example of the kind of proof that might have been sufficient would be residue on the defendants' bodies or clothing of paint or putty from the cut out sections where the marijuana had been concealed), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981). Three appellants—Pimienta Redondo, Pupo, and Lozada—had previously been involved in ventures to import controlled substances.[6] Evidence of

---

**4.** Appellants vigorously contest the reliability of this evidence. The boarding officer testified that the odor was detected near the main hold, where the wind was blowing. The marijuana was sealed in compartments below, and no odor was detected in the areas adjacent to where it was stowed. We must, however, view the evidence in the light most favorable to the government. It is possible that an odor of marijuana escaped from the compartments because of pressure changes or through air vents.

**5.** The lack of an apparent legitimate purpose for the *Gilfon*'s voyage, and appellants' role as professional crewmen, among other things, distinguish this case from two drug smuggling cases in which this court reversed convictions. *United States v. Mehtala*, 578 F.2d 6, 9–10 (1st Cir. 1978); *United States v. Francomano*, 554 F.2d

483, 486–88 (1st Cir.1977). In those cases, relatively small amounts of marijuana had been found floating in the wakes of the vessels. In *Mehtala,* the vessel was transporting coffee and sugar. We saw no reason to connect defendant to an importation scheme; she was a young college graduate on a pleasure cruise. In *Francomano,* defendants joined the vessel to travel; they thought it was going to Europe to participate in bicentennial races.

**6.** Pimienta Redondo had pleaded guilty in May 1982 to charges of conspiring to possess marijuana with an intent to distribute it in violation of 21 U.S.C. § 955c, which applies to drug smuggling aboard vessels. Pupo had pleaded guilty in March 1978 to aiding and abetting in the importation of a controlled substance in viola-

prior experience in similar operations was probative of their knowledge of the activity in which the *Gilfon* was involved. *United States v. Wright-Barker,* 784 F.2d 161, 171 (3d Cir.1986); *United States v. Ricardo,* 619 F.2d 1124, 1131 (5th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980). Finally, knowing participation by Orlando Molinares Charris can be inferred from his role on board the *Gilfon.* According to the testimony of his brother, who was the vessel's captain, he was hired to handle the vessel's engine and machinery. It would be logical to infer that a person with such responsibilities would know that a vessel had compartments filled with marijuana instead of the usual complement of fuel tanks. *See United States v. Lopez,* 709 F.2d at 748 (navigator of a vessel must have known of the nature of its voyage).

In sum, there was sufficient evidence regarding the vessel's operations in general and each of the appellants in particular from which the requisite state of mind could be inferred. It was the jury's responsibility to assess the credibility of the witnesses and decide what inferences could be fairly drawn. "The evidence need not exclude every reasonable hypothesis of innocence, and if it can support varying reasonable interpretations, the jury is entitled to choose among them." *United States v. Quejada-Zurique,* 708 F.2d 857, 859 (1st Cir.) (citations omitted), *cert. denied,* 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983). Our role is to decide only whether its conclusion was reasonable. *United States v. Guerrero-Guerrero,* 776 F.2d at 1075. We hold that it was.

## IV. THE EVIDENCE OF OTHER CRIMES

Appellants contest the district court's ruling allowing the evidence of prior crimes

tion of 21 U.S.C. § 952(a) and § 960(a)(1). A special agent of the Drug Enforcement Administration testified that in February 1980 Lozada was a crewman on a vessel that had been seized with 26,880 pounds of marijuana on board. By arrangement with Colombia, Lozada was deported instead of prosecuted in the United States.

to be admitted. The court ruled that records of Pimienta Redondo's and Pupo's convictions and Lozado's arrest and deportation were admissible evidence because they were highly probative of the intent and knowledge of these defendants.[7]

Federal Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or acts "is not admissible to prove the character of a person in order to show that he acted in conformity therewith," but it is admissible for other reasons, including to prove intent and knowledge. Appellants claimed to have been unaware that marijuana was being transported on the *Gilfon.* Evidence of their prior involvement in smuggling controlled substances, even though the operations occurred several years earlier, tended to disprove their claim of "mere presence," and was, therefore, probative of their state of mind. *See* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[12], at 404–84 to –86 (1986) ("evidence of another crime which tends to undermine defendant's innocent explanation for his act will be admitted"). Thus, the prior crimes evidence was admissible under Rule 404(b), subject only to the limitation of Rule 403 that it should have been excluded if the probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *United States v. Zeuli,* 725 F.2d 813, 816 (1st Cir.1984).

The balance in this case weighed heavily in favor of admissibility. The court made it clear against whom the evidence could be considered and for what reasons. It instructed the jury that the evidence of Lozada's prior arrest was admitted "only, and I wish to emphasize only, for the limited

7. The government initially sought to admit such evidence against five defendants. It withdrew its request to present evidence of a prior arrest of Emilio Camargo, who is not a party to this appeal. In addition to evidence of prior crimes by the three appellants, evidence of a prior conviction of the captain, Nicanor Molinares Charris, who also is not a party to this appeal, was admitted.

purpose, the limited purpose of showing knowledge or intent on the part of Mr. Alfredo Lozada." The court gave the same kind of instruction regarding the evidence of Pimienta Redondo's and Pupo's prior convictions. We hold that it was not an abuse of discretion to admit the evidence of prior crimes, given its probative value in proving appellants' intent and knowledge, and in the light of the steps the court took to minimize the risk that it would be considered for an improper reason.

■ Some of the appellants make a second argument regarding the evidence of prior crimes. They claim that the court erred by not severing the trial to prevent the evidence of prior crimes admitted against particular defendants from prejudicing the other defendants. "The grant or denial of severance is clearly within the sound discretion of the trial court and its action on such a motion will be overturned only when there has been a clear abuse of such discretion." *United States v. Davis*, 623 F.2d 188, 194 (1st Cir.1980). For us to disturb the court's decision, appellants must make a strong showing of prejudice that amounts to a denial of their right to a fair trial. *United States v. Lochan*, 674 F.2d 960, 967 (1st Cir.1982); *United States v. Davis*, 623 F.2d at 194. They have not done so.

In considering whether a trial should be severed, "[t]he inconvenience and expense to the Government and witnesses of separate trials must be weighed by the trial court against the prejudice to the defendants inherent in a joint trial." *United States v. Davis*, 623 F.2d at 194. The risk of prejudice posed by other wrongful acts evidence, which is admissible against only particular defendants, can be alleviated with a limiting instruction. *See United States v. Porter*, 764 F.2d 1, 14–15 (1st Cir.1985). A special agent with the Drug Enforcement Administration testified about Lozada's arrest. Immediately after he gave his testimony, the court told the jury:

Now, you are expressly admonished that the testimonial evidence ..., as to Mr. Alfredo Lozada, has been admitted for this limited purpose that I have informed you, as tending to show intent or knowledge on his part. You are further admonished that you are not to consider this evidence, testimonial evidence, ... as to any other defendants in this case, other than Mr. Lozada. Is that clear? It is not to be considered as to any of the other eight defendants in any way.

The court gave a similar instruction after admitting records of the prior convictions of Pimienta Redondo and Pupo, telling the jury "not to consider these three exhibits as to any of the other defendants. These three exhibits cannot be considered as to any of the other six defendants, in any way, is that clear? Do you understand my instructions?"

We recognize that in some circumstances even the best limiting instruction may be inadequate to restrict the use of prior wrongful acts evidence to the appropriate defendants. The evidence could be so complex or confusing that the jury will consider it cumulatively and convict all of the defendants, rather than making individual determinations of guilt or innocence. *See United States v. Bright*, 630 F.2d 804, 813 (5th Cir.1980). In this case, however, the proof was neither complex nor confusing and the jury instructions were clear.

## V. THE SHIP'S LOG

Appellants also argue that the district court erred in ruling that the government could enter into evidence copies of pages of the *Point Whitehorn*'s ship's log that described the events of May 15–17. The issue arose when the boarding officer testified that just before the second boarding, the *Gilfon*'s captain was observed tearing papers and throwing them overboard. He said he did not have personal knowledge of the event, but that it was described in the ship's log. Defense counsel objected to this testimony on the ground that it was inadmissible hearsay. The government moved to enter the log into evidence. Defense counsel objected, arguing that a proper foundation had not been laid, and that admitting this evidence would "prejudice" the jury because the log contained reports of the boarding party's findings

during the search. There were entries regarding the boarding, the irregularities in the sounding tubes, the authorization received from Honduras, and the discovery of the concealed compartments.

The court admitted the log into evidence as a record of a regularly conducted activity under Federal Rule of Evidence 803(6). Appellants contend that Rule 803(8) prohibited the use of the log as evidence. Rule 803(8) makes an exception to the inadmissibility of hearsay for reports "of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel.*" (Emphasis added.) Appellants argue that reports excluded under this rule cannot be admitted even if they qualify under other hearsay exceptions.

■ We need not decide whether the court erred in admitting the log into evidence, because, even if it did, the error was harmless. Appellants compare this evidence to that involved in *United States v. Ware*, 247 F.2d 698 (7th Cir.1957), in which the court reversed a conviction because envelopes that contained narcotics agents' annotations about the alleged crimes were erroneously admitted into evidence. The error was not harmless, the court held, because the notes, which went into the jury room, provided the jury with "a neat condensation of the government's whole case against the defendant." *Id.* at 700.

The log book did not summarize the evidence that proved appellants' guilt. It was merely cumulative evidence of some of the testimony given by the boarding officer, and he was cross-examined. Much of the evidence supporting appellants' convictions, such as that regarding the paint, the welding equipment, and prior convictions and arrest, did not appear in the log. The only additional evidence the log provided was the entry noting that the *Gilfon*'s captain was seen tearing up papers. This was only relevant insofar as it suggested the captain was trying to hide something, and he is not an appellant in this case. The report of his

action did not contribute appreciably to the government's case concerning whether appellants were knowing participants in drug smuggling. Even if the court did err by admitting the log into evidence, the error was harmless. *See United States v. Wright-Barker*, 784 F.2d at 173–74 (finding no reversible error when the trial court admitted into evidence a Coast Guard officer's report that recorded various events of a search and seizure of a vessel; rather than a record of the whole case, the document was merely cumulative of other evidence, and, the court said, "it is highly probable that no prejudice occurred" if the document's author has been cross-examined); *United States v. Treadwell*, 760 F.2d 327, 340 (D.C.Cir.1985) (finding no prejudice in allowing jury to consider a document not admitted into evidence that summarized the testimony of a federal agent), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

## VI. THE DECISION TO EXCUSE A JUROR

■ The final issue concerns the district court's decision to excuse a juror and allow the remaining eleven jurors to return a verdict. Federal Rule of Criminal Procedure 23(b) provides that "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." *See United States v. Smith*, 789 F.2d 196, 205 (3d Cir.) (holding this provision to be constitutional), *cert. denied*, — U.S. —, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *United States v. Stratton*, 779 F.2d 820, 831 (2d Cir.1985) (same), *cert. denied*, — U.S. —, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986). Appellants' argument, in essence, is that there was no "just cause" in this case. We disagree.

The court was first alerted that there was a problem with a juror after deliberations had been in progress for about two hours. The jury foreman sent a note to the judge, which said: "One of our jurors is having some nervous problems. I would like to have a suggestion about this mat-

ter." All parties agreed that the judge should meet privately with the troubled juror.

The juror was in tears. She told the judge that the first time she felt nervous and upset was when the defense began their closing arguments, and that she started crying when the first vote was taken. She said that she had reacted in this way before, and gave conflicting answers about whether or not she could continue as a juror. The judge told her to go to the courtroom with the marshal.

About fifteen minutes later, after the judge had a chance to meet with counsel, the juror was interviewed a second time. She was still crying and said that she did not think she would be able to serve. She also disclosed that she had just taken sinus medication.

The judge met with counsel again, and discussed the alternatives. It was Friday afternoon; defense counsel urged the court to continue the case until Monday morning, in the hope that the juror's condition would improve. The judge initially decided to continue the case until Saturday morning. When the juror was called in to be told this, she disclosed that she had just taken a second pill, this time a tranquilizer. The judge then decided that it would be too great a risk to the juror's health to continue the case and force her to return.

As our recounting of these events makes clear, the judge did not make her decision rashly. We should not be quick to second-guess a trial judge, who was in a better position than we are to assess the severity of the situation. After making careful inquiries, and recognizing her responsibility for the well-being of those called upon to serve the court, the judge decided that the risk to the juror's health was too great to subject her to further trauma. This was not an abuse of discretion.

## VII. CONCLUSION

When they were encountered by the Coast Guard, appellants were on the high seas aboard a vessel of Honduran registry transporting marijuana. By agreement with Honduras, the waters in which appellants' vessel was seized were designated as "customs waters of the United States." This enabled the government to prosecute them under subsection (c) of 21 U.S.C. § 955a. As we construe the statute, this agreement did not also render the "vessel subject to the jurisdiction of the United States on the high seas," which is the jurisdictional prerequisite for a conviction under subsection (a) of 21 U.S.C. § 955a. We therefore reverse appellants' convictions under subsection (a). We hold that there was sufficient evidence to support the conviction under subsection (c), and as to appellants other arguments, we find no reversible error.

*Reversed in part, affirmed in part. Remanded to the district court for resentencing.*