[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12702

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JUAN CARLOS ACOSTA HURTADO,
ASDRUBAL QUIJADA MARIN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cr-00488-CEH-JSS-2

_____

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

PER CURIAM:

All panel members agree that the judgment of the District Court is due to be affirmed. The only disagreement arises from defining the holding of a particular prior panel precedent that relates to one of the issues that is raised in this appeal. For reasons explained in Judge Carnes's concurring opinion, which is joined by Judge Grant, the two of them do not join the last two paragraphs of Part IV.A. of Judge Tjoflat's opinion. As a result, those two paragraphs do not reflect the views of this Court in this case. The views of this Court on that matter are the ones expressed in the concurring opinion of Judge Carnes.

TJOFLAT, Circuit Judge:

The United States Coast Guard apprehended Asdrubal Quijada Marin and Juan Carlos Acosta Hurtado—as well as five other co-defendants—aboard a motor vessel, the *Zumaque Tracer*, in the Caribbean Sea. Marin and Acosta Hurtado were convicted after a bench trial in the Middle District of Florida for (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States and (2) possession with intent to distribute five kilograms or more of cocaine on a vessel subject to the jurisdiction of the United States, pursuant to the Maritime Drug Law Enforcement Act (the MDLEA). *See* 46 U.S.C. §§ 70503(a), 70506(a)–(b); 21 U.S.C. § 960(b)(1)(B)(ii).

On appeal, Marin and Acosta Hurtado appeal the denial of several pre-trial motions. Marin appeals the denial of a motion to dismiss the indictment for lack of jurisdiction. Acosta Hurtado appeals the same. Acosta Hurtado additionally appeals the denials of: (1) a motion to suppress evidence, because he alleges the stop and search of the *Zumaque Tracer* violated the Fourth Amendment; (2) a motion to dismiss the indictment, based on unnecessary delay; and (3) a motion to dismiss the indictment, because of outrageous government conduct. After careful review of the record and with the benefit of oral argument, we find these challenges unpersuasive and accordingly affirm the District Court's judgments.

## I.

The issues on appeal were addressed in a pre-trial evidentiary hearing. We therefore take the substantive facts leading up to Acosta Hurtado and Marin's indictment from the evidence in the record at that time and the witnesses presented at that hearing. Some of the facts also come from a certificate submitted by the Government from United States Coast Guard Commander David M. Bartram as designee of the Secretary of State (the Certificate).[1] By and large, the parties do not dispute the facts.

---

[1] We treat a certificate of someone designated by the Secretary of State to act on the part of the Department of State, as was Commander Bartram here, the same as a certificate of the Secretary of State himself. *See United States v. Hernandez*, 864 F.3d 1292, 1299 (11th Cir. 2017) 46 U.S.C. § 70502(d)(2) ("The response of a foreign nation to a claim of registry . . . is proved conclusively by certification of the Secretary of State *or the Secretary's designee.*" (emphasis added)).

*A.*

On August 12, 2019, a British vessel with a United States law enforcement detachment spotted the motor vessel *Zumaque Tracer*, a roughly 260-foot vessel, anchored in international waters between Aruba and Venezuela.[2] The *Zumaque Tracer* flew a Republic of Cameroon flag. The British vessel engaged in right-of-approach questioning. Right-of-approach questioning is authorized by international law and can be conducted by a law enforcement vessel in international waters as a matter of course. *The Marianna Flora*, 24 U.S. 1, 10–11, 11 Wheat. 1, 5–6 (1825). Right-of-approach questioning aims at ascertaining the nationality of a vessel traveling in international waters. *See United States v. Marino-Garcia*, 679 F.2d 1373, 1385 (11th Cir. 1982) ("Under international law, the Coast Guard has the authority to approach an unidentified vessel in order to ascertain the vessel's nationality.").

The United States law enforcement personnel on board the British vessel reported the results of the right-of-approach questioning to District Seven—the United States Coast Guard district responsible for coordinating and commanding action in the Caribbean Sea—in Miami. Generally, the Coast Guard districts

---

[2] The Certificate states:

> On August 12, 2019, U.S. law enforcement personnel detected the motor vessel ZUMAQUE TRACER at anchor in approximate position 12-22.72 N, 070-14.42 W, approximately 2.5 nautical miles west of Aruba's territorial sea limit and 3 nautical miles from Venezuela's territorial sea limit, seaward of the territorial sea of any State.

immediately command assets in their jurisdictional waters and re-
port up to Coast Guard headquarters. Through the right-of-ap-
proach questions, the Coast Guard learned that the master of the
*Zumaque Tracer*—Marin—claimed Cameroonian registry, the ves-
sel had been anchored for twenty-one days with an engine prob-
lem, the vessel was not transmitting on Automated Information
Systems (AIS),[3] and the vessel only had a crew of seven. After en-
gaging in their deliberative process and based on the information it
had received from the British vessel, District Seven determined that
the *Zumaque Tracer* was suspicious and warranted boarding. Dis-
trict Seven, therefore, "requested to invoke the Article 17 process
through Coast Guard headquarters," which involves the "Govern-
ment of the United States . . . reach[ing] out to the . . . flag state and
ask[ing] for permission to . . . exercise law enforcement authority
on behalf of the flag state."[4] The Coast Guard received no response

---

[3] According to witness testimony, AIS is a "feature that transmits the vessel's
position, course, speed, [and] operational . . . character, meaning [whether the
vessel is] underway, or anchored." AIS signals can be received by other vessels
and stations ashore. Its uses involve avoiding collisions with other vessels and
allowing the vessel to be found in case of distress. But AIS also allows a vessel
to be found by law enforcement vessels. Having no functioning AIS, there-
fore, could allow a vessel to avoid detection, but would also risk the safety of
the vessel and any vessel that may come within close proximity to it.

[4] The Certificate states:

> On August 13, 2019, under Article 17 of the United Nations
> Convention Against Illicit Traffic in Narcotic Drugs and Psy-
> chotropic Substances of 1988, the Government of the United
> States requested that the Government of the Republic of

6                    Opinion of the Court                  21-12702

for many days, during which the British vessel monitored the anchored *Zumaque Tracer* and awaited further direction.[5]

Having waited multiple days with no response from Cameroon granting permission to board, the British vessel had to move on. A vessel with the Dutch Coast Guard, again containing a United States Coast Guard detachment, assumed monitoring duties while the United States continued to await permission to act on its suspicions from Cameroon. On August 20, 2019, the *Zumaque Tracer* weighed anchor and entered the territorial waters of Venezuela—where the United States lost contact with the vessel—and the Dutch vessel continued its patrol duties elsewhere.

At some point over the next ten days, having been unable to order the boarding and search of what the Coast Guard believed to be a suspicious vessel, District Seven sent the Coast Guard cutter *Northland* to patrol a section of the Caribbean Sea where the cutter might find the *Zumaque Tracer* after it emerged from Venezuelan territorial waters. On August 30, 2019, the *Northland* encountered

---

Cameroon verify the vessel's registry and, if confirmed, grant permission to stop, board, and search the vessel.

[5] When a Coast Guard or allied vessel monitors a suspected vessel while awaiting further instruction from the appropriate district, the law enforcement vessel does not necessarily stay directly adjacent to the suspected vessel. According to the District Seven Coast Guard commander at the evidentiary hearing, a Coast Guard vessel can be as far as three miles away, keeping "eyes" on the suspected vessel across the horizon or via radar.

the *Zumaque Tracer* in international waters, roughly 180 nautical miles south of Haiti.[6]

The *Northland* engaged in right-of-approach questioning, revealing the following suspicious aspects of the vessel in addition to what the Coast Guard already knew from the previous right-of-approach questioning. First, the *Zumaque Tracer* was pointed 285 degrees true (north northwest), which would eventually cause the vessel to arrive at land around northern Honduras or Grand Cayman. Yet, the vessel claimed to be headed for Panama, much further to the south. Second, the *Zumaque Tracer* said it had come from Venezuela—where it allegedly conducted repairs—but the vessel appeared to be in the same bad shape observed earlier in August.[7] Marin also claimed—again—that the purpose of the vessel's voyage—this time to Panama—was for repairs. Third, the *Zumaque Tracer* was in a known narcotics-ferrying corridor of the

---

[6] The Certificate says, "On August 30, 2019, U.S. law enforcement personnel relocated ZUMAQUE TRACER at approximate position 15-03.4 N, 074-36.3 W, approximately 205 nautical miles southeast of Kingston, Jamaica and seaward of the territorial sea of any State."

[7] The *Zumaque Tracer* had multiple holes that were visibly taking on water, including a six-by-ten-foot hole on the back left of the vessel. Eventually, the *Northland* crew would learn the following. The vessel was equipped with three generators, but only one was working—the others having been disassembled for parts—and it was only able to power part of the ship. Further, the vessel had two engines. One was not running, and the other had started leaking cooling water—risking overheating—during the *Northland*'s boarding and had to be turned off. The *Zumaque Tracer* was discovered to have a dewatering pump on board that needed active attention and was keeping the vessel afloat. The vessel also lacked fresh food, water, and sanitary devices.

Caribbean.  Fourth, the *Zumaque Tracer* had only a crew of seven—all of Venezuelan nationality, and none of whom were on deck. The minimum manning crew for this vessel was nine crewmembers.  The *Northland* was of roughly the same size and had a crew of about ninety-five people.  Fifth, the AIS on board the *Zumaque Tracer* was still off; in fact, Marin—the master of the vessel—claimed to not even know how to use it or what AIS was.  International standards require ships of 300 gross tons or more to use AIS; the *Zumaque Tracer* had a gross weight of over 2,500 tons.  Sixth, the *Zumaque Tracer* had trouble maintaining a steady course.  Seventh, despite being a cargo vessel, the *Zumaque Tracer* apparently had no cargo on board nor any equipment with which to handle cargo.

Again, the *Northland* communicated these findings to District Seven.  District Seven in turn communicated with Coast Guard headquarters, requesting to invoke the Article 17 process to board the *Zumaque Tracer*.  Coast Guard headquarters presumably requested that the Republic of Cameroon grant the United States permission to engage in law enforcement activities on Cameroon's behalf by boarding and searching the *Zumaque Tracer*.  This time, a response—in the affirmative—arrived fairly quickly and Coast Guard headquarters authorized District Seven to order the *Northland* to stop, board, and search the *Zumaque Tracer*.[8]  In so

---

[8] The Certificate says, "On August 21, 2019, the Government of the Republic of Cameroon confirmed that ZUMAQUE TRACER was registered in Cameroon, and granted permission for U.S. law enforcement personnel to stop, board, and search the vessel."  It is unclear whether Cameroon was asked for

permitting the United States Coast Guard to board and search the *Zumaque Tracer*, Cameroon confirmed that the vessel was indeed registered as a Cameroonian vessel.

A boarding team from the *Northland* eventually boarded the *Zumaque Tracer* where the team engaged in a three-step search. First, the team confirmed the identity and nationality of the vessel. Second, the team performed an initial safety sweep—including mustering the crew—to ensure the vessel was safe for Coast Guard personnel to be aboard. Third, the team searched for evidence of criminal activity.

On August 31, 2019, the search crew from the *Northland* found 140 bales of what appeared to be cocaine inside wing tanks—typically filled to ballast the ship—in the engine room.[9] Two consecutive field tests revealed that at least one of the bales indeed contained cocaine. The *Northland* crew passed this information along to District Seven, which informed Coast Guard headquarters, which requested that Cameroon waive jurisdiction over the crew of the *Zumaque Tracer*.

District Seven also instructed the *Northland* to treat the seven crew members of the *Zumaque Tracer* as detainees and bring them back to the *Northland*. The *Northland* crew was not able to

---

permission again on August 30. Either way, *before* United States law enforcement personnel stepped foot on the *Zumaque Tracer*, the government of Cameroon had given permission for a search of the vessel on its behalf.

[9] The Certificate says the amount of cocaine retrieved weighed "approximately 4,225 kilograms."

transfer the contraband until September 3 due to a hurricane in the area. The boarding of the *Zumaque Tracer* ended on the same day. On September 5, the *Zumaque Tracer* sank, having taken on too much water—its dewatering pump likely having become disabled without active attention.

Throughout September and October, District Seven inquired about the status of the jurisdiction waiver at least four times. Additionally, the United States government reiterated its request that Cameroon waive jurisdiction on September 19.

While waiting for word from Cameroon, the *Zumaque Tracer* crew remained handcuffed to the decks of various Coast Guard vessels.[10] They were housed under a shelter, ate the same meals as the crew of the *Northland*, were allowed bathroom breaks and showers, and were seen by a Coast Guard medical officer twice a day. Because they were at sea, however, the crew had no contact with family, attorneys, or a judge. While on board the various Coast Guard vessels, the *Zumaque Tracer* crew were neither read their *Miranda* rights nor interrogated.[11] In total, while awaiting a response from Cameroon, the *Zumaque Tracer* crew was transferred between approximately five different Coast Guard vessels before finally being brought ashore to the United States.

---

[10] The *Northland* passed the seven *Zumaque Tracer* crewmembers to a different Coast Guard vessel around September 13.

[11] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

District Seven later learned—on October 12—that Cameroon had deleted the *Zumaque Tracer* from its registry on September 18, 2019.[12]  Coast Guard authorities that same day "granted a statement of no objection to assimilate the vessel to without nation status" and considered the United States to have jurisdiction over the crew.  The vessel on which the *Zumaque Tracer* crew was detained made for Puerto Rico on the same day, arriving in the late morning of October 18.  Upon arriving in Puerto Rico, federal agents took into custody the crew of the *Zumaque Tracer*, having been indicted on October 16.[13]  The crew were then processed by Customs and Border Protection in San Juan, Puerto Rico and flown to Tampa, arriving around 5:00 P.M. on Friday, October 18.  Only afterwards were the crew read their rights and questioned.  On

---

[12] The Certificate says:

> Subsequently, the Government of the United States received through law enforcement channels a Cameroon vessel registry deletion certificate dated September 18, 2019, for the ZUMAQUE TRACER.  The deletion certificate specified that the Government of the Republic of Cameroon had permanently deleted ZUMAQUE TRACER from its vessel registry and could no longer fly the Cameroonian flag due to the vessel's illicit drug trafficking activity described in the preceding paragraphs that had been reported to the Government of the Republic of Cameroon by the Government of the United States.

[13] A grand jury in the Middle District of Florida indicted Marin, Acosta Hurtado, and the five other crew members for conspiracy to possess and knowingly and intentionally possessing with intent to distribute five or more kilograms of cocaine in violation of 46 U.S.C. §§ 70503(a), 70506(a)–(b).

Monday morning, they were arraigned in Tampa. That same day, the president of Cameroon consented to the United States's exercise of jurisdiction over the crew of the *Zumaque Tracer*. Cameroon reaffirmed its consent to jurisdiction in writing on October 24.

*B.*

Relevant to this appeal, Marin filed a motion to dismiss the indictment challenging jurisdiction under the MDLEA on January 15, 2020. Acosta Hurtado moved to adopt the motion at a hearing before the magistrate judge on January 22. The magistrate judge granted the motion to adopt. Marin also filed a motion to suppress evidence, which encompassed the cocaine found on board the *Zumaque Tracer*, on January 15. Again, Acosta Hurtado moved to join the motion. The magistrate judge granted Acosta Hurtado's motion to join in an order on January 27. Acosta Hurtado additionally filed a motion to dismiss based on violations of Federal Rules of Criminal Procedure 5 and 48, as well as unnecessary pre-indictment delay and due process violations on March 17.

A magistrate judge held a day long evidentiary hearing on March 5 addressing, in relevant part, the motions to dismiss and suppress. The Government presented evidence and examined witnesses, including the commander of District Seven at the time of the *Zumaque Tracer*'s interdiction as well as crew members who were on the *Northland* on August 30. The various defense attorneys for the defendants cross-examined the Government's witnesses but did not present any affirmative evidence.

On April 24, the magistrate judge issued a Report and Recommendation that, in relevant part, recommended the District Court deny the motions to dismiss and suppress. The District Court accepted the magistrate judge's recommendation in an order on November 6.

Eventually, on May 7, 2021, the District Court held a short bench trial for Marin and Acosta Hurtado. The District Court adjudicated them guilty of conspiracy to possess and actual possession with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States pursuant to a stipulation with the Government. The District Court subsequently sentenced Marin and Acosta Hurtado to a term of imprisonment.[14] Marin and Acosta Hurtado timely appealed.

---

[14] Acosta Hurtado stipulated to the following:

> IT IS HEREBY AGREED BY AND BETWEEN the United States of American and the defendant, Juan Carlos Acosta Hurtado, by and through his attorney, Jorge Leon Chalela, Esq, that the following statements are true and that no evidence need be presented by the United States at trial or in any further proceedings regarding the same:

> 1. On or about July 31, 2019, the U.S. Coast Guard Cutter (USCGC) NORTHLAND located the motor vessel (M/V) ZUMAQUE TRACER, a 256 foot Cameroon flagged coastal freighter, in the international waters of the Caribbean Sea, approximately 200 nautical miles southeast of Kingston, Jamaica on a northwesterly course towards Grand Cayman. The defendants, Asdrubal Quijada Marin, Juan Carlos Acosta Hurtado, Rafael Antonio Querales Grafe, Edwin Ramon Marcano Morales, Juan Carlos DiazMorales, Henry Jose Marquez, and

Jose Rafael Perez Colina were the seven crew members of the M/V.

2.      The NORTHLAND conducted right of approach questioning to determine and verify the nationality of the ZUMAQUE TRACER.  During the right of approach questioning, defendant Asdrubal Quijada Marin, identified himself as the master of the vessel and claimed that the purpose of the voyage was to transit to its next port of call in Panama.

3.      During the Coast Guard's subsequent search of the M/V, the boarding team located and seized 143 bales containing approximately 4,225 kilograms of cocaine concealed in the vessel's aft wing ballast tanks.

4.      On November 6, 2020, this Court [the District Court] entered an Order that proper jurisdiction existed in this case over the objections of the defense.

5.      The defendant, Juan Carlos Acosta Hurtado, willingly agreed to transport approximately more than 5 kilograms of cocaine aboard the M/V ZUMAQUE TRACER with his codefendants and others.  The purpose of this agreement was to smuggle this cocaine through international waters and distribute the cocaine to other persons.  The defendant knew that the bales onboard the M/V ZUMAQUE TRACER and seized by the U.S. Coast Guard contained five or more kilograms of cocaine and knew that the planned voyage was a drug smuggling venture.

Marin stipulated to the same.  Though both stipulations state that the *Zumaque Tracer* was interdicted on July 31, this is clearly a scrivener's error since the overwhelming weight of the record points to interdiction occurring on August 30.

## II.

We review a motion to dismiss an indictment for an abuse of discretion. *United States v. Castaneda*, 997 F.3d 1318, 1325 (11th Cir. 2021). This Court, however, reviews a denial of a motion to dismiss an indictment de novo if the asserted ground is outrageous government conduct. *Id.* While we review subject matter jurisdiction de novo, we review for clear error a district court's factual findings underlying its jurisdiction decision. *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016) (per curiam). Finally, the denial of a motion to suppress involves mixed questions of law and fact. *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017). This Court reviews a district court's factual findings for clear error and the application of the law to those facts de novo. *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1301 (11th Cir. 2021).

## III.

### A.

The MDLEA prohibits certain acts while "on board a covered vessel." 46 U.S.C. § 70503(a). The definition of covered vessel includes "a vessel subject to the jurisdiction of the United States." *Id.* § 70503(e). The MDLEA further defines a vessel subject to the jurisdiction of the United States multiple ways. Two definitions are relevant for purposes of this appeal, each providing a potential route to jurisdiction over the crew of the *Zumaque Tracer*: (1) "a vessel without nationality" and (2) "a vessel registered in a foreign nation if that nation has consented or waived objection to the

enforcement of United States law by the United States." *Id.* § 70502(c)(1).

The statute further defines each of these routes. One way a vessel could be "without nationality" is if the vessel's "master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed." *Id.* § 70502(d)(1)(A). Consent or waiver by a flag nation "may be obtained by radio, telephone, or similar oral or electronic means" and "is *proved conclusively* by certification of the Secretary of State or the Secretary's designee." *Id.* § 70502(c)(2) (emphasis added). Because we decide that Cameroon properly consented to United States jurisdiction over the crew of the *Zumaque Tracer*, we need not address whether jurisdiction could be exercised under the first route—characterizing the *Zumaque Tracer* as a vessel without nationality once its registration was deleted.

"[T]his Court has 'interpreted the "on board a vessel subject to the jurisdiction of the United States" portion of the MDLEA as a congressionally imposed limit on courts' subject matter jurisdiction.'" *Iguaran*, 821 F.3d at 1336 (quoting *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008)). Additionally, we frequently entertain jurisdictional challenges under the MDLEA. *See, e.g.*, *United States v. Nunez*, 1 F.4th 976, 984 (11th Cir. 2021); *United States v. Cabezas-Montano*, 949 F.3d 567, 588 (11th Cir. 2020); *United States v. Hernandez*, 864 F.3d 1292, 1298 (11th Cir. 2017); *Iguaran*, 821 F.3d at 1336; *United States v. Tinoco*, 304 F.3d 1088, 1112 (11th Cir. 2002).

Though Marin and Acosta Hurtado can challenge jurisdiction—and this Court will entertain that challenge—they have limited standing to do so, as will soon become clear. We begin with the text of the MDLEA itself. "Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense." 46 U.S.C. § 70504. Additionally:

> A person charged with violating section 70503 of this title . . . does not have standing to raise a claim of failure to comply with international law as a basis for a defense. A claim of failure to comply with international law in the enforcement of this chapter may be made only by a foreign nation. A failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter.

*Id.* § 70505. So, even though Marin and Acosta Hurtado can challenge jurisdiction, the potency of any such challenge is very limited.

### B.

We do not patrol the world's oceans, asserting jurisdiction over wrongdoers wherever they may be found regardless of citizenship or flag of nationality. *See Marino-Garcia*, 679 F.2d at 1380 ("To insure the principle of freedom of the seas, international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas."). To do so would create an untenable fish-eat-fish environment governed only by *realpolitik* on the high seas. In such an environment, the same way that our

18                    Opinion of the Court                    21-12702

Coast Guard could seize a vessel registered in a foreign nation, take its foreign citizens to the United States, and prosecute them under United States law, an unfriendly nation could do the same to Americans on board a United States-flagged vessel. This is how Marin and Acosta Hurtado would like to characterize what happened to them, but it is not quite true.

On the other hand, the opposite approach—limiting our Coast Guard to only patrolling United States waters or approaching only vessels flying the United States flag—risks transforming international waters into aquatic avenues for piracy, and illegal smuggling of illicit drugs, weapons, and humans. This portrait, much like that above, also does not reflect reality. *See id.* at 1382 ("Vessels without nationality are international pariahs. They have no internationally recognized right to navigate freely on the high seas.").

The real law—provided by treaties,[15] the MDLEA, and international law—strikes a balance between no free navigation and

---

[15] It is worth noting that the Republic of Cameroon has not signed the two potentially relevant treaties here. *See* Convention on the High Seas, *opened for signature* Apr. 29, 1958, 13 U.S.T. 2312; United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, *opened for signature* Dec. 20, 1988, 28 I.L.M. 493. This in no way affects our analysis:

> Even absent a treaty or arrangement, the United States could, under the "protective principle" of international law, prosecute foreign nationals on foreign vessels on the high seas for possession of narcotics. The protective principle permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security or could

lawlessness.  Relevant to this appeal, this law includes allowing law enforcement vessels to engage in right-of-approach questioning. This questioning allows nations to identify the pariahs of the sea. *See id.*  Vessels without nationality (or those that claim multiple nationalities) are pariahs in part because they effectively attempt to secede from all lawful authority (or evade particular authorities) merely by being in international waters.  For that same reason, the law allows a nation, as the MDLEA allows the United States, to exercise jurisdiction over a stateless vessel in international waters. If it did otherwise, the law would allow a ship-full of people to become sovereign on their own accord; being subject to no territorial jurisdiction and no flag state jurisdiction.  *See id.* ("[F]lagless vessels are frequently not subject to the laws of a flag-state.  As such, they represent 'floating sanctuaries from authority' and constitute a potential threat to the order and stability of navigation on the high seas." (citation omitted)).  These allowances all go to striking the balance between the two extremes above.

The flag of a nation gives occupants of that vessel protection of a sort by the law of the flag nation.  But if a flag nation waives jurisdiction or consents to another nation's jurisdiction, the wrongdoing crew must be held to answer to the nation that caught them in an illicit act in international waters—otherwise they would answer to no sovereign and no law.  In operating on a ship with a

---

potentially interfere with the operation of its governmental functions.

*United States v. Romero-Galue*, 757 F.2d 1147, 1154 (11th Cir. 1985).

certain nation's flag, the crew risks that the flag nation will consent to jurisdiction by another.  To leave such a crew answerable to no nation—neither an uninterested flag state nor an apprehending state—risks creating the same dystopian seas as would leaving stateless vessels or vessels that claim multiple flags untouchable.

## C.

The MDLEA's jurisdictional provision reflects this same principle in allocating much of the jurisdictional determination to the executive branch—the branch of the federal government responsible for foreign relations.  "[T]he MDLEA's jurisdictional provisions allocate power between the courts and the executive as to which of the two will be responsible for complying with U.S. obligations under the international law of criminal jurisdiction." *Hernandez*, 864 F.3d at 1303–04.  That is why a certification by the Secretary of State or his designee serves as *conclusive proof* of jurisdiction.  In relying on the certificate, the judicial branch acknowledges that "the statutory requirements for MDLEA prosecution in U.S. courts have been met, while recognizing that any further jurisdictional complaint over that U.S. prosecution is to be handled by the executive branch, nation-to-nation, in the international arena." *Id.* at 1304; *see also Tinoco*, 304 F.3d at 1108 ("[T]he jurisdictional requirement [of the MDLEA] was inserted into the statute as a diplomatic courtesy to foreign nations and as a matter of international comity in order to avoid 'friction with foreign nations.'" (quoting *United States v. Gonzalez*, 776 F.2d 931, 940 (11th Cir. 1985))).

Here, the Government submitted the Certificate finding jurisdiction. Our analysis could probably stop there. But Cameroon also validly waived jurisdiction. The fact that formal waiver did not occur until after the crew of the *Zumaque Tracer* arrived in the United States and were indicted is of no moment. The MDLEA limits the United States's courts' subject matter jurisdiction, but the MDLEA's jurisdictional provision is, importantly, not a right of criminal defendants. Rather, it is a tool to make sure courts protect comity among nations—protection that is already ensured by the Certificate. Cameroon green-lit the prosecutions of Marin, Acosta Hurtado, and their co-defendants. The timing of that green light is irrelevant. It does not offend Cameroon's sovereignty for the United States to prosecute the *Zumaque Tracer*'s crew because Cameroon has waived its claim of jurisdiction.

This Court said the following regarding the timing of consent to board a vessel by the United States Coast Guard: "What is important is that the [flag nation] ratified the decision to board before this case came to trial. The timing of the consent makes no constitutional difference since evidence obtained from a boarding premised on anticipated consent which never materializes would have to be excluded." *United States v. Reeh*, 780 F.2d 1541, 1547 (11th Cir. 1986). The same is true with jurisdiction. At any point between when the United States began asserting jurisdiction over Marin and Acosta Hurtado and when Cameroon consented to the United States's exercise of jurisdiction, Cameroon could have decided to exercise its own jurisdiction. At that point, the prosecution

could have been stopped and the defendants extradited to Cameroon. But that is all hypothetical, because Cameroon *did* consent.

In holding that flag nation consent to United States jurisdiction is valid even if given after prosecution has begun, we appear to be in good company with our sister circuits. *See United States v. Bustos-Useche*, 273 F.3d 622, 627 (5th Cir. 2001) ("The only statutory prerequisite to the district court's jurisdiction under [the MDLEA] is that the flag nation consent to the enforcement of United States law before trial."); *United States v. Juda*, 46 F.3d 961, 966 (9th Cir. 1995) ("We have held, however, that when MDLEA jurisdiction is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent."); *United States v. Greer*, 285 F.3d 158, 175 (2d Cir. 2002) ("[The MDLEA's] jurisdictional element may be satisfied by consent provided any time before trial.").

*D.*

Marin also argues that Cameroon could not have consented to jurisdiction when it did because, by October 21, the *Zumaque Tracer* had been deleted from the Cameroonian registry. Marin's Br. at 20. Thus, Cameroon would have had no jurisdiction to waive at that point. We reject this argument because it admits the *Zumaque Tracer* was stateless after the registry deletion—still providing for jurisdiction under the MDLEA. This is so because there was no other nation that could have had jurisdiction over the vessel. Under Marin's reading—no Cameroon jurisdiction, but also not stateless—the *Zumaque Tracer* would be one of those

floating pariahs, immune from any law. International law does not allow this.

We hold that the District Court properly exercised jurisdiction over Marin and Acosta Hurtado under the MDLEA.

## IV.

Next, Acosta Hurtado—and only Acosta Hurtado—appeals the denial of the motion to suppress. He asserts the District Court should have suppressed pieces of evidence such as the cocaine found aboard the *Zumaque Tracer*, his post-*Miranda* statement procured after arriving in the United States, and his identity because they were all fruit of an unconstitutional search and seizure.

### A.

As a threshold question, we must determine if the Fourth Amendment even applies to Acosta Hurtado. The United States Supreme Court says no. In *United States v. Verdugo-Urquidez*, the Supreme Court held that the Fourth Amendment does not apply to people who are not United States citizens or resident aliens and who are searched or seized by United States law enforcement outside the United States. 494 U.S. 259, 274–75, 110 S. Ct. 1056, 1066 (1990). In so holding, the Supreme Court explicitly stated that its reasoning applied to law enforcement interdictions in international waters: "There is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters." *Id.* at 267, 110 S. Ct. at 1061. According to the Supreme Court, foreign nationals found abroad

24                    Opinion of the Court                    21-12702

lack the requisite connections to this country to be considered part of "the people" protected by the Fourth Amendment. As a Venezuelan citizen found to be committing a crime in international waters, Acosta Hurtado cannot claim the protections of the Fourth Amendment.

This Court has recently—and firmly—held that the Fourth Amendment does not apply to those in Acosta Hurtado's shoes. In *Cabezas-Montano*, a case involving a vessel interdicted by the United States Coast Guard in international waters, 949 F.3d at 580, a panel of this Court explicitly held that "the Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien *arrested in international waters or a foreign country*." *Id.* at 593.

Under the prior panel precedent rule, however, "each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court."[16] *United States v. Smith*, 201 F.3d 1317, 1322 (11th Cir. 2000) (quoting *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993)). This is true even of erroneous precedent. *See United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even [if] convinced it is wrong.").

---

[16] "The holding of a case comprises both 'the result of the case and those portions of the opinion necessary to that result.'" *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) (quoting *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009)).

*Tinoco*—decided twelve years after *Verdugo-Urquidez* and eighteen years before *Cabezas-Montano*—involved a foreign vessel with a crew of foreign citizens stopped in international waters. *See Tinoco*, 304 F.3d at 1091–93. On appeal, a panel of this Court considered "whether evidence concerning the cocaine seized by the Coast Guard should have been suppressed at trial under the Fourth Amendment." *Id.* at 1116. The *Tinoco* Court proceeded to analyze the Coast Guard's stop of the vessel under a reasonable suspicion framework, "conclud[ing] that the district court did not err in ruling that the Coast Guard acted consistently with the Fourth Amendment when it stopped and boarded the vessel in this case."[17] *Id.* Though decided twelve years after *Verdugo-Urquidez*, the *Tinoco* Court did not address that case and came to an inconsistent conclusion. It is also worth noting that the *Cabezas-Montano* Court did not address *Tinoco* in holding that the Fourth Amendment did not apply to the defendants in that case.

True, *Tinoco* does not explicitly hold that the Fourth Amendment applies to foreign nationals interdicted in international waters. But *Tinoco* holds that the district court did not err in finding that the Coast Guard's behavior conformed with the Fourth Amendment. And *Tinoco*, not *Cabezas-Montano*, is this Circuit's first holding on that particular issue of law. We therefore must

---

[17] We pause to note the brief alternative holding that follows the Fourth Amendment analysis. The *Tinoco* Court held in the alternative that "even if reasonable suspicion had not been present," the crew "effectively abandoned the [cocaine] and thus have no Fourth Amendment standing to challenge the seizure." *Tinoco*, 304 F.3d at 1117.

follow *Tinoco* despite its erroneous application of the Fourth Amendment.

### B.

Nevertheless, the *Northland*'s stop and search of the *Zumaque Tracer* did not violate the Fourth Amendment, so the District Court did not err in denying the defendants' motion to suppress evidence. With no Fourth Amendment violation, there can be no fruit of a Fourth Amendment violation. Under *Tinoco*'s erroneous Fourth Amendment analysis (similar to the analysis this Court used prior to *Verdugo-Urquidez*), law enforcement ships need only reasonable suspicion—not probable cause—to stop and search a vessel on the high seas. *See Tinoco*, 304 F.3d at 1116; *United States v. Padilla-Martinez*, 762 F.2d 942, 950 (11th Cir. 1985).

"To determine whether a suspicion was reasonable, we evaluate the totality of the circumstances surrounding the stop, including the collective knowledge of all officers involved in the stop." *United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019). In determining reasonable suspicion, law enforcement personnel may make "common sense conclusions." *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981). And reasonable suspicion can exist even if each observation "alone is susceptible of innocent explanation." *United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 753 (2002); *see also Reeh*, 780 F.2d at 1544 ("[I]t is also well established that circumstances completely consistent with legal conduct may still amount to reasonable suspicion."). "Probable cause 'is not a high bar,'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586

(2018) (citation omitted); by sheer force of logic, reasonable suspicion must be even lower.

Considering the totality of the collective knowledge from all of the Coast Guard decisionmakers in late August 2019, there was certainly reasonable suspicion that the *Zumaque Tracer* was engaged in illegal activity.  The Coast Guard knew that (1) the AIS was not on (and the master of the vessel did not know how to use it), (2) the *Zumaque Tracer* should have been repaired in Venezuela and was not, (3) the vessel's purported destination made no sense, (4) the *Zumaque Tracer* was not outfitted for cargo as its nature would have suggested, (5) the vessel had a dangerously small crew, (6) the *Zumaque Tracer* was having trouble maintaining a steady course, and (7) the vessel was in a known drug smuggling corridor.  Together, these observations went well beyond reasonable suspicion.  Additionally—and perhaps more importantly—the Coast Guard obtained Cameroon's permission to board and search the vessel.

## C.

Acosta Hutado errs in asserting that each individual observation that builds into reasonable suspicion must constitute evidence of crime.  Not only do courts analyze reasonable suspicion based on the totality of the circumstances, but each individual observation can be innocuous, and certainly need not itself be *evidence of crime*.  For instance, it may not be illegal to drive down the freeway with a bumper sticker that says, "I sell drugs," but a state trooper would be foolish to overlook such an observation if other

circumstances suggest the car might contain drugs.  The bumper sticker goes to reasonable suspicion.

Acosta Hurtado also makes a staleness argument.  But the information on the ground—or water—was refreshed when the *Northland* encountered the *Zumaque Tracer*.  The suspicious observations before boarding that day were therefore as fresh as could be.  If the staleness argument only goes to the staleness of Cameroon's consent, this argument is meritless.  Foreign nation consent is not like a warrant.  Permission to board and search is a function of the flag nation's sovereignty, not of United States criminal procedure.  Unlike a warrant, which must be specific, permission to board and search is general.  The odds of stale information spoiling a good warrant does not neatly apply to general permission to board and search a foreign nation's vessel.

We therefore hold that the District Court did not err in denying the motion to suppress evidence based on a Fourth Amendment violation.

## V.

In addition to the Fourth Amendment challenge, Acosta Hurtado alone raises an unnecessary delay argument under due process and Federal Rules of Criminal Procedure 5 and 48.[18]

---

[18] The District Court ruled that arguments regarding the challenges under the Federal Rules of Criminal Procedure contained in Acosta Hurtado's motion to supplement his motion to dismiss were untimely.  We do not weigh in on the timeliness question because the arguments are obviously meritless.

*A.*

"To establish a violation of a defendant's Fifth Amendment rights, the defendant must show that 'pre-indictment delay caused him actual substantial prejudice and that the delay was the product of a deliberate act by the government designed to gain a tactical advantage.'" *United States v. Gayden*, 977 F.3d 1146, 1150 (11th Cir. 2020) (quoting *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996)). Whether or not Acosta Hurtado was prejudiced by the admittedly long delay between initial detainment on board the *Northland* and indictment, he cannot satisfy the second prong. Acosta Hurtado provides nothing but "conclusory assertions about the [G]overnment's timeline" that suggests the United States held him and his co-defendants at sea intentionally to gain a tactical advantage over him. *Id.* In fact, the most likely reason for the delay from the record seems to be that the Coast Guard was truly making a good faith effort to avoid the jurisdictional problem discussed above. Further, Acosta Hurtado and his co-defendants remained uninterrogated the entire time they were on the Coast Guard vessels, so it is unclear what tactical advantage the United States could have possibly obtained over them.

*B.*

Not only does Acosta Hurtado not have a constitutional unnecessary delay claim, his challenge under the Rules of Criminal Procedure fares no better:

> This Court[, in *United States v. Purvis*,] held that various factors are considered in determining whether a

> delay was unnecessary, including: (1) the distance be-
> tween the location of the defendant's arrest in inter-
> national waters and the U.S. port he was brought to;
> (2) the time between the defendant's arrival at the
> U.S. port and his presentment to the magistrate
> judge; (3) any evidence of mistreatment or improper
> interrogation during the delay; and (4) any reason for
> the delay, like exigent circumstances or emergencies.

*Cabezas-Montano*, 949 F.3d at 591 (citing 768 F.2d 1237, 1238–39 (11th Cir. 1985)).[19]

The first factor weighs in favor of Acosta Hurtado. It was a multi-day journey from where the *Zumaque Tracer* was interdicted to San Juan, but not a forty-eight-day journey—forty-eight days counting from September 3, when the search of the vessel ended, to October 21, when the defendants saw a magistrate.

The second factor weighs against Acosta Hurtado. The crew of the *Zumaque Tracer* arrived in the United States on a Friday. They had to be processed by Customs and Border Protection. From San Juan, they were flown to Tampa—the federal district where they had already been indicted by a grand jury two days prior—and arrived at 5 P.M., the end of the business day. The defendants saw a magistrate the very next opportunity: Monday morning. *Cf. County of Riverside v. McLaughlin*, 500 U.S. 44, 57, 111 S. Ct. 1661, 1670 (1991) (requiring defendants to be brought

---

[19] It is worth noting that *Cabezas-Montano*, though on plain error review, involved a 49-day delay. 949 F.3d at 591–92.

before a magistrate judge for a probable cause determination within forty-eight hours after *a warrantless arrest*, unlike here where defendants were arrested pursuant to an indictment and warrant).

The third factor also weighs against Acosta Hurtado. None of the crew were interrogated and all evidence points to them having been treated humanely—eating the same food as the *Northland*'s crew and being provided showers, a toilet, and medical care. The testimony at the evidentiary hearing suggests the amenities on the *Northland* (even for detainees) were superior to those on the *Zumaque Tracer*.

The fourth factor weighs against Acosta Hurtado. The reason for the delay was clearly that the Coast Guard did not think it had jurisdiction to bring the defendants to the United States. In other words, the Coast Guard's goal of acting lawfully caused the delay. The "allegation that the government deliberately and tactically delayed in order to forum shop is pure speculation and unsupported by any record evidence." *Cabezas-Montano*, 949 F.3d at 592. Again, Acosta Hurtado provides only conclusory assertions that the delay was to gain a tactical advantage. He provides zero evidence to support those assertions.

Not only does Acosta Hurtado not show that the District Court erred under the *Purvis* framework, dismissing this indictment would not comport with the policy behind Rule 5. "[T]he purpose of Rule 5(a) is to prevent oppressive police interrogations and other 'third-degree' tactics before bringing the accused in front of an officer of the court." *Id.* at 591. To argue that such tactics or

interrogations happened here would be to blatantly ignore the record. In analyzing Rule 5, the Supreme Court has said, "[t]he duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience." *Mallory v. United States*, 354 U.S. 449, 455, 77 S. Ct. 1356, 1359–60 (1957). Rather, "delay must not be of a nature to give opportunity for the extraction of a confession." *Id.* at 455, 77 S. Ct. at 1360. The delay here had nothing to do with extracting a confession, and dismissing this indictment would do nothing to deter bad law enforcement tactics. The only thing it might deter is the Coast Guard carefully waiting for jurisdiction, but we would not want to encourage that change.[20]

## C.

Acosta Hurtado appears to make a few other arguments that go to delay. None of them persuade us. First, he says that rather than (1) prematurely bring the *Zumaque Tracer* crew to the United States before Cameroon consented to United States jurisdiction or (2) waiting for forty-eight days at sea, the United States should have brought the crew to Cameroon for prosecution. This argument does not hold water. Rather than proceed with caution—as the Coast Guard did here—Acosta Hurtado suggests that the United States should do the following: sail across an ocean on a Coast

---

[20] Here, it is hard to imagine how a Rule 48 challenge for delay can help Acosta Hurtado. We have already analyzed how the delay does not warrant dismissal, and Rule 48 is discretionary. A "court *may* dismiss an indictment . . . if unnecessary delay occurs." Fed. R. Crim. P. 48(b) (emphasis added).

Guard *warship* into the territorial waters of another nation without permission to give them seven detainees over whom the nation has expressed no interest in exercising jurisdiction. To read the argument is to see its absurdity. Acosta Hurtado rejoins that the United States could have received permission to bring the *Zumaque Tracer* crew to Cameroon. But Cameroon was not responding to the United States's request for consent or waiver, which implicitly already asked if Cameroon wanted to exercise jurisdiction over the defendants. How could requesting another way—"can we bring these defendants to Cameroon for you to exercise jurisdiction?"—have elicited any quicker a response?

Acosta Hurtado also argues that he was prejudiced by the delay because it caused him to confess—post-*Miranda*—"admitting of knowledge of the presence of the contraband under joint and constructive possession circumstances and of the conspiracy to possess with the intent to distribute." Acosta Hurtado Br. at 42. None of this changes the analysis, however, because Acosta Hurtado *stipulated to the same facts even more directly* over a year later on the advice of the same counsel he has on appeal. [21]

We therefore hold that the District Court did not err in denying Acosta Hurtado's motion to dismiss based on unnecessary delay arguments.

---

[21] Acosta Hurtado also asserts that "this Court presumes our delay as 'unnecessary'" based on Judge Rosenbaum's concurrence in *Cabezas-Montano*. Acosta Hurtado Br. at 40. It goes without saying, but concurring and dissenting opinions in this Circuit do not constitute precedential law.

## VI.

Finally, Acosta Hurtado raises an outrageous government conduct claim.  "Outrageous conduct is only a potential defense in this circuit because neither the Supreme Court nor this Court has ever found it to actually apply and barred the prosecution of any case based on it." *Castaneda*, 997 F.3d at 1324 ("Like the fabled creature Sasquatch, this defense has entered the common consciousness and is mentioned from time to time.  Some claim to have caught fleeting glimpses of it in the remote backwoods of the law, but its actual existence has never been confirmed.").  Acosta Hurtado points to nothing in the intervening two years between *Castaneda* and now that would change that assessment.

In theory, "[o]utrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees."  *United States v. Jayyousi*, 657 F.3d 1085, 1111–12 (11th Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007)).  In other words, law enforcement would need to somehow cause the defendant to engage in criminal conduct. Acosta Hurtado points to nothing to suggest as much in his circumstance.  Any alleged outrageous conduct took place after Acosta Hurtado committed his crime.

Other than the entrapment-like circumstances, "the defense can only be invoked in the rarest and most outrageous circumstances," when the government conduct "violate[s] that

fundamental fairness, shocking to the universal sense of justice, mandated by the due process clause of the fifth amendment." *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984) (quotation marks and citations omitted). Acosta Hurtado points to nothing that fits the bill. As already discussed, the delay was far from outrageous, and the crew were treated humanely in detention. In fact, this Court has not blinked an eye in the past at the practice of housing detainees on the decks of Coast Guard vessels under some sort of shelter, with or without restraints. *See Purvis*, 768 F.2d at 1239 (detainees kept handcuffed on the deck of a Coast Guard vessel); *Nunez*, 1 F.4th at 983 (detainees kept on the deck of a Coast Guard vessel, possibly shackled).

Acosta Hurtado has not found Sasquatch, or—more appropriately here—the Kraken. The *Zumaque Tracer* sunk as a result of the mundane—disrepair—not a sea monster. Likewise, with the exception of a delay attributable to Cameroon, Acosta Hurtado's detention was fairly run-of-the-mill, not a result of outrageous government conduct.

Accordingly, the District Court's judgments are

**AFFIRMED**

ED CARNES, Circuit Judge, joined by GRANT, Circuit Judge, concurring:

We concur in the judgment of the Court in this case, which affirms the judgment of the district court. We also join in all of Judge Tjoflat's opinion except for the discussion in the last two paragraphs of Part IV.A. Those two paragraphs reflect his view of the panel decision in *United States v. Tinoco*, 304 F.3d 1088, 1116–17 (11th Cir. 2002). He believes *Tinoco* held that Fourth Amendment protections extend to noncitizens and nonresidents in foreign territory or on a ship in international waters, and "thereby came to an inconsistent conclusion" from *Verdugo-Urquidez*, 494 U.S. 259 (1990), which held that they do not. *See* Lead Op. at 24–26.

If *Tinoco* held what Judge Tjoflat believes it did, it would be inconsistent with the decision in *Verdugo-Urquidez*, which preceded *Tinoco*. The Supreme Court held in *Verdugo-Urquidez* that the Fourth Amendment does not apply to searches and seizures of property owned by noncitizen, nonresidents located in another country. *See* 494 U.S. at 261 ("The question presented by this case is whether the Fourth Amendment applies to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country. We hold that it does not.").

But *Tinoco* is not inconsistent with *Verdugo-Urquidez*. What Tinoco did is affirm the denial of a motion to suppress made on Fourth Amendment grounds when there was reasonable suspicion that a foreign crew was violating the laws of the United States and

the defendants lacked Fourth Amendment standing.  *Tinoco*, 304 F.3d at 1116–17.  That does not implicate *Verdugo-Urquidez's* holding.

The *Tinoco* opinion had no occasion to address whether the same actions would have violated the Fourth Amendment if there had been no reasonable suspicion to believe that the foreign crew had been violating the laws of the United States.  It did not purport to hold anything about that different scenario.  A holding that X + 1 (search of a foreign ship in international waters plus reasonable suspicion) does not violate the Fourth Amendment is not inconsistent with a holding that X alone (search of a foreign ship in international waters without reasonable suspicion) also does not violate it.

The *Tinoco* opinion does say that "the district court did not err in ruling that the Coast Guard acted consistently with the Fourth Amendment when it stopped and boarded the vessel in this case." *Id*. at 1116.  But that does not mean the *Tinoco* decision must have *held*, as our colleague fears, that the Fourth Amendment applies to searches of foreign crew members on a foreign ship outside the territorial waters of the United States. *See* Lead Op. at 26.  The quoted statement does not mean that because it is dicta, not a holding.

Our circuit law is rock-solid and clear as a mountain stream that the only statements in, or parts of, an opinion that are holdings are those that are necessary to the result of the decision that the opinion accompanies.  *See, e.g., United States v. Gillis*, 938 F.3d 1181,

1198 (11th Cir. 2019) ("The holding of a case comprises both the result of the case and those portions of the opinion necessary to that result.") (quotation marks omitted); *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 725 (11th Cir. 2020) ("Our statement . . . in [an earlier case] was not necessary to the decision we reached, so it is not part of our holding."); *Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1290 (11th Cir. 2013) ("[B]ecause those statements in [an earlier] opinion are not necessary to the result in that case . . . they are not the holding of the decision."); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1265 (11th Cir. 2007) ("[J]udicial opinions do not make binding precedents; judicial decisions do.").

Statements that are not necessary to the result are dicta. *See, e.g., United States v. Shamsid-Deen*, 61 F.4th 935, 949 n.1 (11th Cir. 2023) ("Because the statement . . . was not necessary to the result in that case, it was dicta."); *Rambaran v. Sec'y, Dep't of Corrs.*, 821 F.3d 1325, 1333 (11th Cir. 2016) ("[T]he statement is dicta because it was not necessary to the result in [the earlier case]."); *Powell v. Thomas*, 643 F.3d 1300, 1304–05 (11th Cir. 2011) ("As we've said, dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us, whereas holding is comprised both of the result of the case and those portions of the opinion necessary to that result by which we are bound.") (quotation marks omitted).

And neither we nor anyone else is required to follow dicta, not even a few steps down the decisional path. *See also, e.g., Pretka*

*v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010) ("We are not required to follow dicta in our own prior decisions.  Nor for that matter is anyone else.") (citation omitted); *Welch v. United States*, 958 F.3d 1093, 1098 (11th Cir. 2020) ("Dicta is not binding on anyone for any purpose."); *United States v. Pickett*, 916 F.3d 960, 966 (11th Cir. 2019) (same); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.  All statements that go beyond the facts of the case . . . are dicta. And dicta is not binding on anyone for any purpose.") (citations omitted).

The result of the appeal in the *Tinoco* case was a ruling that the district court correctly denied the motion to suppress and therefore the convictions were due to be affirmed.  304 F.3d at 1116–17, 1125.  In the course of reaching that ruling and result, the panel opinion did not state that the Fourth Amendment applies to searches and seizures involving noncitizen, nonresidents outside the territorial jurisdiction of the United States.[1]  But even if the

---

[1] At most, the *Tinoco* panel assumed for purposes of that case that the Fourth Amendment applied, because it didn't make any difference since the Coast Guard had reasonable suspicion to believe the ship was carrying illegal drugs, which is enough by itself for the search to pass muster under the Fourth Amendment.  Assuming away unnecessary issues or questions to decide a case on easier or more efficient grounds is a basic part of Judging 101.  We all do it with some regularity.  And as we have explained when presented with assumptions about the law that prior panels made in the course of deciding an appeal: "assumptions are not holdings" for purposes of the prior precedent rule.  *United States v. Jackson*, 55 F.4th 846, 853–54 (11th Cir. 2022), *cert. granted,*

21-12702               Opinion of the Court                    5

*Tinoco* opinion had said that it does, that statement would not have been necessary to the result in the appeal.  It wouldn't have been necessary to the result because there was reasonable suspicion to justify the search and seizure in *Tinoco* anyway; and the defendants in that case also lacked statutory standing to raise the issue.

Reasonable suspicion that a search will turn up contraband is enough to justify a search and seizure of a foreign ship and its crew in international waters.  *United States v. Williams*, 617 F.2d 1063, 1089 (5th Cir. 1980) (en banc) ("We have held that the Coast Guard undoubtedly had grounds for a reasonable suspicion that they would find contraband in the hold of the [foreign vessel in international waters].  Therefore, the search satisfied the requirements of the [F]ourth [A]mendment."); *United States v. Reeh*, 780 F.2d 1541, 1546–47 (11th Cir. 1986) ("These considerations have led us to apply the 'reasonable suspicion' standard, not probable cause, to boardings of foreign vessels in international waters."); *United States v. Glen-Archila*, 677 F.2d 809, 813 (11th Cir. 1982) (stopping a vessel on the high seas does not violate the Fourth Amendment if there is reasonable suspicion that it is engaged in smuggling contraband into the United States).  And the *Tinoco* panel found there was reasonable suspicion aplenty.   *Tinoco*, 304 F.3d at 1116

_____

143 S. Ct. 2457 (2023); *accord*, *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) ("Such assumptions are not holdings."); *cf. Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed" a position on it, "we are free to address the issue on the merits" without regard to stare decisis).

(explaining why "it is clear that the Coast Guard had reasonable suspicion to believe that the vessel here was engaged in illegal smuggling activities").

Not only that, but the defendants in *Tinoco* also lacked statutory standing to challenge the search and seizure on Fourth Amendment grounds. *See id*. at 1117 ("Alternatively, even if reasonable suspicion had not been present, [the] challenge to the suppression motion still would fail. This is because the cocaine was seized by the Coast Guard after it was thrown into the ocean by the vessel crew members. The crew members . . . effectively abandoned the contraband and thus have no Fourth Amendment standing to challenge the seizure."). The *Tinoco* panel rejected the defendants' claim on that additional basis as well.

So the same result would have occurred in *Tinoco*, even if the Fourth Amendment did apply to searches and seizures of foreign vessels and their crews in international waters. It follows that nothing the *Tinoco* panel opinion said, or implied, about the Fourth Amendment's application to searches and seizures of foreign crews and ships outside the territorial jurisdiction of the United States was necessary to the rejection of the Fourth Amendment claim and affirmance of the convictions in that case. There is no Fourth Amendment *holding* in *Tinoco*, other than it is not violated where the Coast Guard, acting on reasonable suspicion that a ship is carrying contraband to the United States, searches the ship and its crew. That is not inconsistent with the Supreme Court's earlier

holding in *Verdugo-Urquidez* that the Fourth Amendment does not apply at all to such searches.

This Court should continue doing what the panel did in *United States v. Cabezas-Montano*, 949 F.3d 567, 594 (11th Cir. 2020). Which is to apply the Supreme Court's *Verdugo-Urquidez* decision as though there was no *holding* in the *Tinoco* case about whether Fourth Amendment protections apply to foreign crew aboard foreign vessels in international waters. Which there wasn't.